Herbert **MEISLER**, Plaintiff–Appellant,

v.

**GANNETT COMPANY, INC.; USA Today**, Defendants–Appellees.

No. 92–7052.

United States Court of Appeals, Eleventh Circuit.

Jan. 28, 1994.

Charles A. Dauphin and William J. Baxley, Baxley, Dillard & Dauphin, Birmingham, AL, for plaintiff-appellant.

Robert C. Bernius, Nixon, Hargrave, Devans & Doyle, Washington, DC, for defendants-appellees.

Edward S. Sledge, III, Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, AL, Holliger F. Barnard and James C. Barton, Johnston, Barton, Proctor, Swedlow & Naff, Birmingham, AL, for Gannett Co., Inc.

Before HATCHETT and COX, Circuit Judges, and RONEY, Senior Circuit Judge.

PER CURIAM:

This appeal arises out of an action for libel. Herbert Meisler, the plaintiff, appeals the district court's grant of summary judgment in favor of the defendants Gannett Co., Inc. and USA TODAY ("defendants"). Meisler argues that the district court erred in concluding that the evidence could not support a finding of actual malice. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

In 1987, Herbert Meisler and Harold Ripps became interested in dog racing. In October 1988 Meisler, Ripps, Herman Maisel, and Elliot Maisel, as equal partners, formed the American Racing Group to hold their interests in greyhound parks in Wisconsin, Kansas, and Texas. These four were known as "the Alabamians" or the "Alabama four."

The four, along with some Wisconsin investors, formed Dairyland Greyhound Park, Inc. ("Dairyland") and obtained a license to oper-ate the Dairyland Greyhound Park in Kenosha, Wisconsin. Dairyland Park opened to the public on June 20, 1990, but on July 19, 1990, the Wisconsin Racing Board ("the Board") filed a petition for disciplinary action against Dairyland. A press release issued by the Board noted that the petition alleged that certain individuals "have committed illegal acts of fraud, deception and coercion for financial gain and to halt board investigations." The petition detailed specific improper acts by Dairyland, American Racing Group, and the Alabama investors. The Board's accusations generated a great deal of press coverage.

The Board scheduled a disciplinary hearing for December 20, 1990, but reached a settlement with all parties. That day between 4:00 P.M. and 4:35 P.M. Eastern Standard Time, the Executive Director of the Board verbally announced the terms of the settlement at the scheduled hearing and then presented a settlement agreement and consent order signed by all parties.

The verbal announcement was not detailed but reported that the settlement included imposition of a forfeiture of $1,000,000 and costs totaling $150,000; that there would be complete and total divestiture of all culpable individuals in the matter; that both Elliot Maisel and Herman Maisel had tendered their stock certificates to an escrow account; that American Racing Group would be dissolved and cease operations in Wisconsin; that the four Alabama investors would no longer participate in the kennel booking process and would resign as officers and directors of the Park; and that Elliot Maisel had agreed to divest himself of all ownership interests in Dairyland.

The signed settlement agreement and consent order detailed the settlement's terms and provided that the fine and costs assessed were to be paid by Dairyland, not the four Alabama investors. The agreement required Meisler and Ripps to acquire the stock in Dairyland held by the Maisels, after which the Maisels were to have no interest in Dairyland.

At 4:49 P.M. Eastern Standard Time, the Associated Press issued a wire regarding the

settlement between the Board and Dairyland. The wire was marked "URGENT" and concluded with the notation "MORE." The wire read as follows:

BOARD OKs DAIRYLAND AFTER ACCEPTING SETTLEMENT

BY RICHARD EGGLESTON

Associated Press Writer

MADISON, Wis. (AP)—The State Racing Board Thursday granted an operating license for 1991 to the troubled Dairyland Greyhound Park Inc. after accepting a settlement that removes the race track's Alabama investors.

Under the settlement, the Alabama Group, American Racing Group Inc., will be dissolved and will pay the State $1.15 million to settle a disciplinary action against those investors.

The State has already received the first $600,000 downpayment of the fine and is to receive the remaining $550,000 by Dec. 31.

The decision leaves Dairyland Chairman Richard Decker of Eagle River, a new management team and a group of Wisconsin investors in control of the track.

"I've learned one thing. If you start honest and stay honest, you'll win," Decker told the Board. "It makes one heck of an early Christmas present."

Madison Attorney David C. Mebane, Vice Chairman of the Board who presided at Thursday's meeting, said Dairyland would be held to the letter of its license requirements.

"This Board will continue to monitor the operations of this facility daily," Mebane said. "If this facility falls in violation of any of the regulations, the licensee will be back before this Board post haste."

The settlement also provides for the parties to pay $3.1 million that Dairyland owes to contractors.

Kenosha, Kenosha County and the Town of Somers are to receive $25,000 each for money they lost due to the tardy opening of the track last summer.

Later that day, writer Larry Davis of USA TODAY wrote a two-sentence news item concerning the settlement under the "Wisconsin" heading of the "ACROSS THE USA: NEWS FROM EVERY STATE" section for the December 21, 1990, issue of USA TODAY. The item read:

WISCONSIN

KENOSHA — Dairyland Greyhound Park can reopen Jan. 2, state racing board said. Board removed 4 controversial Alabama investors from track ownership, ordered 4 to pay state $1 million as part of settlement for state racing board violations this year. . . .

Davis's primary source for the article had been the Associated Press ("AP") newswire about the announced settlement. It appears that Davis had also talked by telephone with John Bass, USA TODAY's Wisconsin "stringer." Neither Bass nor Davis specifically recalls talking that day, but no other source is apparent for the statement in Davis's item that the Park could reopen on Jan. 2.

At 5:21 P.M. Eastern Standard Time, thirty-two minutes after the first wire, the Associated Press issued a second wire. The wire read, in relevant part:

URGENT

CLARIFIES that two Alabama investors can retain stock with no role in managing track: UPDATES throughout with further detail background; NOTE story stands for AM–WI—

He says the settlement met the Board's goal of removing the Maisels from any involvement with Dairyland.

The settlement also provides for the parties to pay $3.1 million that Dairyland owes to contractors.

Kenosha, Kenosha County and the Town of Somers are to receive $25,000 each for money they lost due to the tardy opening of the track last summer.

The Racing Board had refused to renew Dairyland's license after a summer of mismanagement allegations.

The Board ruled Dairyland's top management lacked sufficient experience to operate a track after the Maisels withdrew from the operation at the State's demand. The Maisels had been named in a petition filed by Dunleavy accusing them of fraud,

coercion and deception in managing the track.

The allegations had to do with hidden contracts between Dairyland and American Racing Group.

The only wire Davis read was the initial AP wire. Neither Davis nor anyone else at USA TODAY looked for later wires. (Appellant's Br. at 12).

On December 21, 1990, attorneys for Meisler and Ripps sent a letter to USA TODAY asserting that the item in question contained false statements and demanding a retraction. On December 28, 1990, USA TODAY published a correction—again in the "Wisconsin" section—which read:

> CORRECTION—State Racing Board barred 4 Alabama investors from Dairyland Greyhound Park, Inc. management, but did not order all 4 to give up their ownership shares. Dairyland—not the 4 investors—agreed to pay the state $1 million for not starting racing on schedule last summer.

Meisler subsequently filed suit. The complaint includes a single count and asserts a claim for libel. It alleges that the news item in question was false in that Meisler "was never ordered to pay any money as part of any settlement for alleged state racing board violations and was not removed from track ownership." (R.1–1–11). Following discovery, the district court granted the defendants' motion for summary judgment, concluding that no reasonable jury could find actual malice by clear and convincing evidence.

## II. ISSUE ON APPEAL & STANDARD OF REVIEW

Meisler argues that there is evidence to support a finding of actual malice, making summary judgment inappropriate. The defendants contend that summary judgment was proper.

■ We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. *Southpace Properties, Inc. v. Acquisition Group*, 5 F.3d 500, 504 (11th Cir.1993); *Key West Harbour Dev. Corp. v. Key West*, 987 F.2d 723, 726 (11th Cir.1993).

## III. DISCUSSION

■ The test for liability in a defamation action depends on "whether the libeled party is a public or private figure and on whether the defamatory publication addresses a public or private concern." *Silvester v. American Broadcasting Cos.*, 839 F.2d 1491, 1493 (11th Cir.1988). If the plaintiff is a "public figure" or a "limited public figure" and the alleged defamatory publication involved an issue of public concern, the plaintiff must prove the defendant made the publication with actual malice in order to establish liability. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964) (public officials); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342–45, 94 S.Ct. 2997, 3008–09, 41 L.Ed.2d 789 (1974) (public figures and limited public figures); *Silvester*, 839 F.2d at 1493 (same).

■ Throughout this case, Meisler has acknowledged that he is a "public figure" or a "limited public figure." Additionally, he has not argued that the item in question involved a matter of private concern. "Limited public figures" are those who "have thrust themselves to the forefront of particularly public controversies in order to influence the resolution of the issues involved." *Silvester*, 839 F.2d at 1494 (quoting *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009); *see also Long v. Cooper*, 848 F.2d 1202, 1204 (11th Cir.1988) (noting the three-part analysis for establishing limited public figure status adopted in *Silvester*).

Having acknowledged his status, Meisler necessarily agrees that establishing liability requires proof of actual malice by clear and convincing evidence. Actual malice is proven if the defamation plaintiff shows that the defendant made the statement "with knowledge that it was false or with reckless disregard" for its truth or falsity. *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 726.

Meisler argues that defendant USA TODAY, through the actions of Davis, acted with reckless disregard for the truth or falsity of the item in question. Meisler's argument that the evidence supports a finding of "reckless disregard" for truth or falsity essentially rests on three prongs. First, Meisler asserts that the item includes false state-

ments. We will assume this assertion to be true.

Second, Meisler argues that because of the AP newswire's designations of "URGENT" and "MORE," Davis knew that the newswire could not be relied upon and that such reliance constituted a gross deviation from standards of reporting. Meisler provided the affidavit of an expert witness. The witness testified that it was common knowledge in the industry that "URGENT" signifies that the news event had just occurred and that AP had rushed the wire. "MORE," he said, indicates that additional wires on the same story would be forthcoming. He expressed the opinion that no responsible publisher would have published a news item based upon the initial AP wire without consulting subsequent wires.

Lastly, Meisler argues that the second newswire was received before Davis's publication deadline and that the second wire was "ignored." There is evidence to support an inference that the second wire was available to Davis prior to his publication deadline, but the assertion that Davis or others involved were aware of it finds no support in the record.

"Reckless disregard," for purposes of proving actual malice, is shown if "the defendant entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Stated differently, the standard is met by proving that the defendants "actually had a high degree of awareness of [the statement's] probable falsity." *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)). *St. Amant* reaffirms the rule that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." 390 U.S. at 731, 88 S.Ct. at 1325. Both of Meisler's expert witnesses admitted that there was no evidence to indicate that Davis acted with knowledge of the article's falsity, or with serious doubts about the truth of the article, or with a high degree of awareness of the article's probable falsity. At best, the defendants' actions were negligent; negligence is not the appropriate standard for proving actual malice. *See St. Amant*, 390 U.S. at 731–32, 88 S.Ct. at 1325–26.

## IV. CONCLUSION

We agree with the district court's conclusion that no reasonable jury could find actual malice by clear and convincing evidence on this record.

AFFIRMED.