**DIBRELL BROTHERS INTERNA-TIONAL S.A., Plaintiff–Counter–Defendant–Appellant,**

v.

**BANCA NAZIONALE DEL LAVORO, Defendant–Counter–Claimant–Appellee.**

No. 93–8452.

United States Court of Appeals, Eleventh Circuit.

Dec. 2, 1994.

Peter Howard Strott, Griffin Cochrane & Marshall, Alan Mitchell Wolper, K. Dennis Sisk, Hunton & Williams, Atlanta, GA, Scott Reavis Phillips, John Charles Thomas, Virginia W. Powell, Robert F. Brooks, Hunton & Williams, Richmond, VA, for appellant.

Walter W. Driver, Jr., L. Joseph Loveland, Richard Anthony Schneider, Laura Anne Lewis Owens, Dan Hall Willoughby, Jr., Letitia Arrington McDonald, King & Spalding, Atlanta, GA, for appellee.

Before COX, Circuit Judge, JOHNSON, Senior Circuit Judge, and PAINE *, Senior District Judge.

PER CURIAM:

Dibrell Brothers International, S.A. ("Dibrell") brought this civil action against Banca Nazionale Del Lavoro ("BNL") asserting several claims which arise out of BNL's failure to confirm letters of credit issued in favor of Dibrell by an Iraqi bank. On cross-motions for summary judgment, the district court entered a judgment dismissing Dibrell's claims. Dibrell appeals. We affirm in part and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY[1]

■ Dibrell is a Swiss corporation in the business of buying and selling tobacco on the world market. In 1988, Dibrell had the opportunity to sell tobacco to the Iraqi governmental agency that controls tobacco products, the State Enterprise for Tobacco and Cigarettes ("SETC"). However, Dibrell was aware that trading with SETC involved an element of risk due to Iraq's ongoing war with Iran and SETC's possible unwillingness or inability to pay for the tobacco. Although SETC was willing to have its bank, Rafidain Bank (Rafidain), issue a letter of credit in Dibrell's favor, Dibrell perceived that similar risks existed concerning Rafidain's willingness or ability to perform on the letter of credit. Consequently, Dibrell was willing to enter a contract to sell tobacco to SETC only if a reputable, non-Iraqi bank confirmed Rafidain's letter of credit.[2] In the fall of 1988,

Donald Crane, a vice-president of Dibrell, learned that the Atlanta agency of Banca Nazionale Del Lavoro ("BNL")[3] was willing to confirm letters of credit issued by Iraqi banks. (Crane Dep., Feb. 27, 1991, at 48–49.) At that time, the Atlanta agency of BNL was in fact confirming Iraqi letters of credit for other customers. (Silvestri Dep., November 27, 1991, at 68–69.)

■ Based upon this information, Crane contacted Paul von Wedel, an officer at BNL's Atlanta agency in charge of the letter of credit department. On October 20, 1988, Crane and von Wedel discussed by telephone the particular terms pursuant to which BNL would agree to confirm the Rafidain letter of credit. In that conversation, von Wedel orally committed BNL to confirming the Iraqi letter of credit. (Crane Dep., Feb. 27, 1991, at 135.) Specifically, the two agreed to the following terms: (1) BNL would confirm a letter (or letters) of credit on a silent basis[4] for up to four million dollars; (2) the letter(s) of credit had to be advised through BNL's Atlanta agency;[5] (3) the confirmation(s) would cover payment terms of up to one year from the shipment date; (4) BNL would not discount the letter(s) of credit; (5) the guaranteed amount would be available to Dibrell or any of its affiliated companies at any time; (6) the letter(s) of credit could be issued in the name of any Dibrell affiliated company; and (7) BNL's fee would be one and one half percent per annum of the amount to be confirmed, payable at the time of collection under the letter(s) of credit. (Id. at 71, 81, 83, 130, 136; R.4–61 Ex. A.) On October 24, 1988, Crane telexed a letter to von Wedel,

---

* Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Because this case involves the grant of summary judgment, we view the facts in a light most favorable to the non-moving party, Dibrell.

2. A "confirmation" of a letter of credit occurs when one bank agrees to honor, or confirm, another bank's letter of credit. See John F. Dolan, The Law of Letters of Credit ¶ 1.03 (2d ed. 1991). See discussion infra part A–2.

3. BNL is a commercial bank controlled by the Italian government. It is made up of agencies rather than branches.

4. "Silent" confirmations result when the beneficiary rather than the issuing bank requests the confirmation. See discussion infra part A–3.

Dibrell required confirmation on a silent basis because Rafidain refused to request a confirmation from a western bank. Crane speculated that a western bank would calculate the amount of the confirmed letter of credit as part of the total credit extended to an Iraqi bank. Crane further speculated that the Iraqi bank refused to ask for confirmation in order to maximize the open credit available for its own borrowing outside the letter of credit context. (Crane Dep., February 27, 1991, at 71–74.)

5. This requirement was later dropped.

restating the terms on which the two had orally agreed. (R.4–61 Ex. A.) On October 25, 1988, von Wedel telexed a letter to Crane, confirming the agreement reached with Crane in the October 20 telephone conversation. (R.4–61 Ex. B.) Von Wedel's letter indicated that the letter of credit to be confirmed would be issued by the Rafidain Bank in Baghdad. (*Id.*) Finally, the telex provided that in addition to the one and one half percent fee, a negotiation fee of one-tenth of one percent of the amount to be confirmed would also apply. (*Id.*)

Having made an agreement with BNL to confirm the Iraqi letter of credit, Dibrell entered into a sales contract with SETC in early November. (Crane Dep., Nov. 6, 1991; R.4–61 Ex. C.) On November 10, 1988, Crane advised von Wedel by telephone of the specifics of Dibrell's sale of tobacco to SETC ("first sale"), including the fact that the sale price and thus the amount of the letter of credit had increased. Crane documented the conversation with a follow-up telex, which reiterated that the sale was to be covered by a confirmation of the letter of credit "under the conditions agreed in our telex of 24 October and your fax of 25 October 1988." (R.4–61 Ex. D.) On December 1, 1988, Tom Fiebelkorn, another vice president in BNL's Atlanta agency, faxed a letter to Crane, acknowledging that the amount of the first letter of credit to be confirmed by BNL would be $4,162,500, reflecting the increased sale price. (R.4–61 Ex. E.) This letter also provided that BNL was prepared to confirm additional letters of credit in an amount up to $4,000,000 to cover future tobacco sales by any of Dibrell's affiliates. (*Id.*) Finally, the letter established a fee structure for the confirmation and required that the shipments for the covered sales be made in January and February. (*Id.*) In reliance upon this representation to confirm additional letters of credit, Dibrell agreed to sell to SETC an additional $3,835,000 worth of tobacco on December 18, 1988 ("second sale"). (Crane Dep., Nov. 7, 1991, at 190–191.)

On December 24, 1988, Rafidain Bank issued its first letter of credit in favor of Dibrell in the amount of $4,162,500. This letter of credit was sent to BNL, directing it to notify or advise [6] Dibrell of the terms and conditions of the letter of credit "without adding your confirmation." (Crane Dep., Feb. 27, 1991, Ex. 30.) On January 10, 1989, BNL sent Dibrell an advice informing it of the issuance and terms of the letter of credit from Rafidain Bank for the first $4,162,500 sale. The BNL advice clearly stated that it was merely an advice and did not constitute an engagement or a confirmation of the Rafidain letter of credit. (R.4–61 Ex. F.) On January 16, 1989, Crane faxed a note to von Wedel acknowledging receipt of the BNL advice on the Rafidain letter of credit and stating, "contrary to what you told me by phone 11 January there is no covering [sic] letter indicating your obligations under this L.C. Please FAX this document to me today." (R.2–42 Ex. F.) According to Crane, von Wedel had told him that a cover letter, restating BNL's obligation to confirm, would accompany the advice. When this letter was not immediately forthcoming, Crane faxed another letter to von Wedel and Fiebelkorn again requesting the "promised letter indicating your confirmation of this Letter of Credit." (R.4–61 Ex. G.) On January 20, 1989, Fiebelkorn responded to Crane's request and informed him that "your confirmation letter will be coming from Paul [von Wedel]. In the meantime, you already have his oral commitment to confirm this credit and our written undertaking to cover this sale for you." (R.4–61 Ex. H.) There is no indication that Dibrell ever received a confirmation of the first letter of credit.

On January 29, 1989, Rafidain issued second letter of credit, which covered the second sale for $3,835,000. On March 27, 1989, BNL sent Dibrell an advice on Rafidain's second letter of credit and again the advice contained language disclaiming any confirmation liability. (R.4–61 Ex. I.) Apparently, no confirmation letter arrived with this advice or at any time thereafter.

---

**6.** When a bank issues an advice of another bank's letter of credit, the advice is merely a notice that the letter of credit has been issued and it does not impose any obligation on the advising bank to pay the beneficiary under the letter of credit. *See* O.C.G.A. § 11–5–103(1)(e).

On June 23, 1989, Dibrell made its first shipment of tobacco to Iraq, valued at $1,831,000, under the letter of credit for the first sale. Dibrell presented BNL with shipping documents for this first shipment in accord with BNL's advice on Rafidain's first letter of credit.[7] On July 11, 1989, BNL forwarded these documents to Rafidain for payment. Dibrell made a second shipment of tobacco worth $721,500 under the letter of credit for the first sale on August 30, 1989. On September 14, Dibrell presented documents to BNL relating to the second shipment in an attempt to comply with the terms of the first letter of credit. On September 25, BNL informed Dibrell that the documents did not comply with the terms of the letter of credit. Rather than argue with BNL about the alleged discrepancies, Dibrell directed BNL to forward the shipping documents to Rafidain Bank. The final shipment covered by the first letter of credit was canceled although $1,609,500 worth of tobacco remained undelivered under the first contract.[8]

Shipments were also made pursuant to the second sale and under the second letter of credit. Dibrell shipped $2,644,000 worth of tobacco on August 7, 1989 and shipped $1,191,000 worth on August 30, 1989 pursuant to the second sale. Dibrell again presented shipping documents in an attempt to comply with the second letter of credit. On September 25, 1989, BNL notified Dibrell that these documents also contained discrepancies. Again, Dibrell directed BNL to forward the shipping documents to Rafidain Bank rather than argue over the alleged discrepancies. Neither Rafidain nor SETC has paid Dibrell on either of the letters of credit.

In early August 1989, federal and state banking authorities raided BNL's Atlanta agency. A subsequent indictment alleged that BNL's Atlanta agency manager, Christopher Drogoul, and his assistants, von Wedel and Fiebelkorn, had conspired to enter illegal credit arrangements to finance the export of goods to Iraq. Fiebelkorn and von Wedel subsequently pled guilty.

Following the raid on the Atlanta office, BNL sent a team of employees from Rome to assume management of the office. The new employees took the position that BNL acted only as an advising bank and not as a confirming bank for the Rafidain letters of credit issued in favor of Dibrell. Thus, BNL's new employees denied the existence of any agreement to confirm the Rafidain letters of credit on a silent basis. BNL notified Dibrell of its position disclaiming confirmation liability in several letters. (*See* Silvestri Dep., Feb. 6, 1991, at 165; Exs. 15, 17, 18, 19.) Accordingly, after SETC failed to pay for the shipments of tobacco Dibrell had made, BNL denied any liability to Dibrell for the value of the shipments.

Dibrell brought this action against BNL to recover for the loss associated with the tobacco shipments. Dibrell asserts several claims including breach of contract, estoppel, negligence, fraud, and civil RICO. On cross-motions for summary judgment, the district court entered summary judgment for BNL.

## II. ISSUES ON APPEAL AND CONTENTIONS OF THE PARTIES

The sole issue on appeal is whether the district court erred in granting summary judgment to BNL. Dibrell contends the court misunderstood the nature of its breach of contract claim and that it erroneously

---

**7.** Both of BNL's advices on the two Rafidain letters of credit indicated its obligation to accept and transmit such documents to Rafidain Bank for payment under the letters of credit.

**8.** Dibrell terminated this shipment to Iraq because of executive orders issued by President Bush prohibiting trade with Iraq, which went into effect during the shipment's trans-Atlantic voyage but prior to the delivery of the tobacco to Iraq. Dibrell was able to resell the tobacco from this aborted shipment at a profit.

There is some disagreement about which shipment was aborted and the value of that shipment. However, we read the depositions and exhibits to mean that the terminated shipment represented the final portion of the tobacco due under the first contract. (*See* Silvestri Dep., Feb. 6, 1991, Ex. 15.) The value of this unshipped tobacco was presumably $1,609,500.00, the difference between the sale price in the first contract and that already shipped to Iraq under the first contract. (*See id.*)

granted summary judgment to BNL on all of Dibrell's claims. BNL, however, maintains the district court did not err. BNL contends that it cannot be held liable on the Rafidain letters of credit because its transactions with Dibrell fail to meet the requirements of the Uniform Commercial Code necessary to impose confirmation liability.

### III. STANDARD OF REVIEW

■■■ This court's review of a grant of summary judgment is plenary and is conducted using the same legal standards as those applied by the district court. *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir.1986). Summary judgment is properly granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). In reviewing a grant of summary judgment by a district court, we view the evidence in a light most favorable to the non-moving party. *Meisler v. Gannett Co., Inc.*, 12 F.3d 1026, 1029 (11th Cir.1994).

### IV. DISCUSSION

The district court based its analysis of Dibrell's claims on its finding that BNL had not issued enforceable confirmations of the letters of credit at issue in this case. The court apparently concluded that Dibrell could prevail only if BNL had actually confirmed the Iraqi letters of credit. Accordingly, the court applied Georgia's UCC law on letters of credit, O.C.G.A. § 11–5–101 *et seq.*, to determine whether the transactions between Dibrell and BNL constituted confirmations. The court concluded that the oral and written communications between Crane and von Wedel did not satisfy the UCC requirements for confirmation. Therefore, the court held that BNL was not liable to Dibrell on the Rafidain letters of credit.

In its motion for summary judgment and brief on appeal, Dibrell has not argued that BNL failed to satisfy confirmation obli-

gations, but rather that BNL breached a contract to confirm the Iraqi letters of credit.[9] Dibrell further contends that a breach of contract claim is a viable cause of action because Georgia letter of credit law retains common law remedies and theories of recovery. BNL argues that allowing Dibrell to assert a claim for breach of a contract to confirm would in effect impose confirmation liability without satisfying the formal requirements of the UCC. BNL further argues that the confirmation requirements of the UCC preclude recovery under any other theory. BNL contends that if the UCC requirements are not satisfied, there can be no confirmation liability.

■■■ The district court only addressed the question of confirmation liability and did not appear to discuss Dibrell's claim that BNL has breached a contract to confirm the Iraqi letters of credit. In fact, the district court referred to Dibrell's claim of breach of "confirmation agreements" as little more than "artful pleadings." We disagree. The UCC does not preclude common law recovery for breach of a contract to silently confirm a UCC-governed letter of credit.

### A. LETTERS OF CREDIT— AN OVERVIEW

#### 1. The Letter of Credit Triangle

The commercial letter of credit has developed over time as a method of payment used in conjunction with documentary drafts to avoid the risks inherent in selling goods on open account. It is a unique device through which a bank extends credit on behalf of a buyer in a cash sale.

■■■ A letter of credit transaction is a three party agreement involving two contracts and the letter of credit. The first contract exists between the buyer and seller, who are respectively referred to as the customer and beneficiary. Pursuant to a provision in this underlying contract, the customer will enter into a contract with its bank, known as the issuer, requesting it to issue a

---

**9.** In the statement of the issues in its brief, Dibrell questions whether the district court erred in concluding that BNL did not issue confirming letters of credit to Dibrell. However, Dibrell never argues this issue in its brief and in fact later concedes that BNL did not issue any confirmations.

letter of credit in favor of the beneficiary. The letter of credit represents the relationship between the issuer and beneficiary. It is an engagement or pledge by the issuer that it will honor the beneficiary's drafts or demands for payment upon the beneficiary's compliance with conditions specified in the letter. O.C.G.A. § 11–5–103(1)(a). Under this arrangement, the beneficiary is ensured payment after presenting the necessary documents to the issuer and avoids possible nonpayment by the customer after shipment of the goods. After honoring the letter of credit, the issuer's possession of the controlling documents secures its right to be reimbursed by the customer for payment to the beneficiary under the letter of credit. *See* O.C.G.A. § 11–5–114(3).

■ The "independence principle" is an important aspect of the letter of credit arrangement, and it embodies the beneficiary's reasons for requesting the use of this device. According to this principle, the issuer's obligation to the beneficiary is independent of performance under the related contracts. The issuer must honor the engagement to pay upon presentation of the proper documents regardless of the beneficiary's performance on the underlying contract. O.C.G.A. § 11–5–114(1). Additionally, the issuer cannot dishonor its obligation merely because the customer fails to perform under the reimbursement contract. *See* O.C.G.A. § 11–5–114; John F. Dolan, *The Law of Letters of Credit* ¶ 2.01 (2d ed. 1991). Thus, the letter of credit can be distinguished from a guarantee because the issuer is primarily liable and cannot assert defenses available to the customer that arise from a breach in the underlying contract.

■ The nature of the relationship between the various parties dictates the basis of liability and theory of recovery if one party defaults on its obligations. Because a contractual relationship exists between the customer and the beneficiary, any recovery for a failure to perform would be based in contract law. Similarly, the relationship between the issuer and customer is of a contractual nature governed by the reimbursement agreement rather than the letter of credit. *See* UCC § 5–109, Cmt. 1 (1993);

Dolan, *supra,* ¶ 2.08[1]. The customer is not a party to the engagement running from the issuer to the beneficiary and cannot assert claims arising from it. Any action for wrongful dishonor must arise from a specific contractual promise by the issuer to honor the beneficiary's demand for payment.

■ The relationship between the issuer and the beneficiary, on the other hand, is of a statutory nature. Georgia's Uniform Commercial Code dictates when the letter of credit takes effect and what duties the issuer owes to the beneficiary. *See* O.C.G.A. §§ 11–5–106(1)(b), 11–5–114. The Georgia Code also offers the beneficiary remedies when the issuer has wrongfully dishonored the demand for payment. *See* O.C.G.A. § 11–5–115. The beneficiary must use one of these remedies. It cannot assert a breach of contract claim against the issuer because no contract exists between the two; rather, an engagement runs from the latter to the former.

### 2. Confirmation: Reconfiguring the Triangle

■ Commercial letters of credit are most frequently used in international trade. When a seller is not satisfied with the credit standing of a foreign bank, the seller may incorporate a term into the underlying contract requiring a local bank to add its engagement to that of the issuing foreign bank. This second engagement, known as a confirmation, is a pledge to honor "a credit already issued by another bank ..." O.C.G.A. § 11–5–103(1)(f).

■ Georgia law requires that the confirmation be in writing and signed by the confirming bank. O.C.G.A. § 11–5–104. Once the formal requirements have been complied with and the letter of credit has been issued, the confirming bank becomes directly liable on the credit "as though it were its issuer and acquires the rights of an issuer." O.C.G.A. § 11–5–107(2). Thus, the beneficiary may present the required documents to either the local confirming bank or the foreign issuing bank and receive payment.

■ Although the seller-beneficiary may require a confirmation as part of the underlying contract and may even select the local bank, it is the issuing bank that requests the correspondent bank to confirm. The relationship that exists between the two banks then is similar to that which exists between the issuing bank and the customer. The confirming bank is extending credit on behalf of the issuing bank and is granted a right of reimbursement against the issuer as a matter of law. *See* U.C.C. § 5–107, Cmt. 2 (1993). Thus, the confirming bank obtains a right of reimbursement against the issuer, independent and separate from any contract right, because it complies with the requirements set forth in the UCC. However, because of a lack of privity between the confirming bank and the customer, the confirming bank has no right of reimbursement against the original customer and owes that customer no duty. *See, e.g., Dulien Steel Prod., Inc. v. Bankers Trust Co.,* 298 F.2d 836, 841–42 (2d Cir.1962); *Petra Int'l Banking Corp. v. First Am. Bank of Virginia,* 758 F.Supp. 1120, 1130 (E.D.Va.1991), *aff'd sub nom. Petra Int'l Banking Corp. v. Dameron Int'l Inc.,* 953 F.2d 1383 (4th Cir.1992). Thus, a new triangular relationship is created consisting of two separate statutory obligations under the UCC and a contract between the two banks.

### 3. Silent Confirmation: The Triangle Collapses

■ The silent confirmation is an interesting commercial banking device that does not appear to have been recognized in any published opinion in either state or federal court. A silent confirmation occurs when a bank agrees to confirm a letter of credit, but the agreement to do so does not appear on the face of the letter. *See* Arthur G. Lloyd, *Sounds of Silence: Emerging Problems of Undisclosed Confirmation,* 56 Brook.L.Rev. 139, 139 (1990). Rather, the beneficiary of the original letter of credit requests the silent confirmation and a separate agreement is entered into between the confirming bank and the beneficiary. *See id.* The issuing bank may or may not know about this agreement. *Id.*

According to the American Bar Association Task Force on the Study of U.C.C. Article 5:

> A confirmation made without the authority of the issuer is not a true confirmation. While a so-called silent confirmation may itself constitute a new and separate letter of credit, commitment to purchase, guarantee, or other obligation binding on the one making it, vis-à-vis the beneficiary, the silent confirmer does not acquire the rights of an issuer on the original credit and is not a confirmer in any sense of the term. The use of the term "confirmer" in the U.C.C. Article 5 should never be construed to imply a reference to a silent confirmer.

The Task Force on the Study of U.C.C. Article 5, *An Examination of U.C.C. Article 5 (Letters of Credit),* 45 Bus.Law. 1521, 1565 (June 1990).

■ We agree with the Task Force. Although it may serve the same end function, a silent confirmation is not the same device as an Article 5 confirmation and clearly falls outside the operation of the UCC. The parties to the silent confirmation differ, as do the rights and obligations under the confirmation agreement.

■ As noted above, the trilateral nature of the letter of credit arrangement defines the rights and duties of each of the parties. The triangle is reconfigured and the rights and duties are redefined once a confirming bank becomes involved in the transaction, yet the basic nature of the relationship is not destroyed by this addition. When a silent confirmation is injected into the letter of credit transaction, the triangle collapses. Here, the seller acts as both the "customer," requesting the confirmation, and the beneficiary, receiving the assurance of confirmation. However, here this "customer" is not asking for confirmation of its own engagement, as would an issuing bank in an Article 5 confirmation, but rather for the engagement of another. When a bank has issued a silent confirmation, it does not share the same relationship with the issuing bank and thus is not afforded the rights and duties provided by Article 5. A silent confirmer may owe a contractual duty to the beneficiary who sought the engagement, but no statutory duty is owed to the issuing bank under

O.C.G.A. § 11–5–107 and § 11–5–109. Also, the silent confirmer has no statutory right of reimbursement from the issuer. *See* U.C.C. § 5–107(2), Cmt. 2 (1993); Perm. Editorial Bd. for the UCC, Rep. No. 2 at 101 (1964).

■■■ Additionally, because the silent confirmer is not in privity with the issuing bank, it has no contractual right to reimbursement. Without any right of reimbursement, the silent confirmer's engagement appears more like a surety agreement rather than an extension of credit.

■■■ The silent confirmation may serve a purpose similar to that of an Article 5 confirmation by providing the beneficiary with an additional source of payment. However, it involves different parties and creates different rights and obligations. In fact, there can be a commitment to silently confirm before the letter of credit is issued; however, the letter must be issued before an Article 5 confirmation can arise. Clearly, a silent confirmation is not an Article 5 confirmation and falls outside the operation of the UCC.

### B. BREACH OF CONTRACT CLAIM

■■■ Any confirmation contemplated by BNL and Dibrell was to be a silent confirmation. Dibrell, the beneficiary, rather than Rafidain, the issuer, requested the confirmation. If BNL had issued the confirmation, it would not have had a duty to Rafidain nor would it have had any statutory or contractual right of reimbursement. As discussed above, any such confirmation would have been operating outside the UCC. Logically, a contract to silently confirm must also fall outside the operation of the UCC. The issue then becomes a question of whether the formal requirements of Article 5, which define confirmation and the corresponding liability, preclude recovery on a common law breach of contract theory for this non-UCC governed device. We find that they do not.

Georgia's Commercial Code provides that common law principles of law and equity "shall supplement" the UCC's provisions "unless displaced by the particular provisions of this title ..." O.C.G.A. § 11–1–103. BNL argues that alternate theories of recovery are displaced by the "particular provisions" of Article 5 that define the requirements necessary to impose confirming bank liability. BNL further contends that because Dibrell has not met these requirements, it is precluded from any recovery. (Appellee's Br. at 34.) We disagree.

We have held that the equitable doctrines of waiver and estoppel apply in a letter of credit case, although not specifically provided for in Article 5. *Pro–Fab, Inc. v. Vipa, Inc.,* 772 F.2d 847, 851 (11th Cir.1985) (citing *Barclays Bank D.C.O. v. Mercantile Nat'l Bank,* 481 F.2d 1224, 1236–37 (5th Cir.1973), *cert. dismissed,* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974)). Significantly, the Georgia courts have also held that common law remedies are available when the theory of recovery falls outside the confines of the UCC. In *First Ga. Bank v. Webster,* 168 Ga.App. 307, 308 S.E.2d 579, 581 (1983), a bank customer sued a bank on its misrepresentation that a deposited check was "good." Although the UCC imposed no statutory duty upon the bank to refrain from such misrepresentations, the trial court allowed the customer's claim. *Id.* at 580. The Georgia Court of Appeals agreed, reasoning that "[w]hile the UCC provides a remedy for the negligent violation of the duties it imposes, it does not provide relief from common law negligence such as is alleged to have occurred in the present case. Therefore, appellee was entitled to bring a common law negligence action against the bank." *Id.* at 581. Similarly, in an Article 6 bulk transfer case, the Georgia Supreme Court allowed the plaintiff to pursue common law remedies notwithstanding the remedies provided by the bulk transfer law. *Boss v. Bassett Furniture Indus.,* 249 Ga. 166, 288 S.E.2d 559, 562 (1982). The court held that "[t]he relationship of the plaintiff in this case to the transferor was multifaceted and he may pursue his common law and equitable remedies, if any, against the transferee without reliance on the bulk transfer law." *Id.* at 562.

■■■ In its brief, BNL distinguishes *Webster* from the instant case, arguing that the plaintiff in *Webster* was free to pursue a common law negligence claim because nothing in the UCC defined how the liability at

issue was to arise. (Appellee's Br. at 34.) Here, BNL argues Dibrell's case. Although the UCC governs Article 5 confirmations, nothing in the UCC defines how liability on a silent confirmation is to arise; therefore, a common law breach of contract action for breach of a contract to silently confirm is permissible. BNL also relies upon *Brannon v. First Nat'l Bank*, 137 Ga.App. 275, 223 S.E.2d 473 (1976) to support its argument that Dibrell is precluded from asserting common law actions for recovery. In *Brannon*, a bank sued under theories of unjust enrichment and breach of warranty when it paid on Article 8 governed securities, later found to be counterfeit. *Id.* at 474. Dismissing the unjust enrichment claim, the court concluded that the warranties were limited to those set forth in the UCC and that to allow recovery under an unjust enrichment claim would render the "specified warranties meaningless and impair the negotiability of securities." *Id.* at 476.

The *Brannon* court's reasoning is inapposite to this case. The securities in *Brannon*, unlike the misrepresentation in *Webster* and the silent confirmation in the instant case, fall within the realm of the UCC and should be governed by its provisions. Furthermore, Article 5 indicates that its provisions are not all encompassing:

> This article deals with some but not all of the rules and concepts of letters of credit as such rules or concepts have developed prior to this title or may hereafter develop. The fact that this article states a rule does not by itself require, imply, or negate application of the same or a converse rule to a situation not provided for or to a person not specified by this article.

O.C.G.A. § 11–5–102(3). As discussed above, a silent confirmation is a situation which is not provided for by Article 5. Therefore, we hold that Article 5 does not preclude recovery for breach of a contract to silently confirm on a common law breach of contract theory.

 Having concluded that Georgia's UCC does not preclude an action for breach of a contract to silently confirm, we must address whether Dibrell and BNL have entered into an enforceable contract to confirm.

In Georgia, a valid contract requires "a subject matter, a consideration, and mutual assent by all parties to all terms." *Lamb v. Decatur Fed. Sav. & Loan Ass'n*, 201 Ga. App. 583, 411 S.E.2d 527, 529 (1991); *see* O.C.G.A. § 13–3–1 (1982). A valid contract also requires the agreement to "be expressed plainly and explicitly enough to show what the parties agreed upon." *West v. Downer*, 218 Ga. 235, 127 S.E.2d 359, 364 (1962). The enforceability of a contract is determined by whether its terms are expressed in plain and explicit language so as to convey what was agreed upon by the parties. *Farmer v. Argenta*, 174 Ga.App. 682, 331 S.E.2d 60, 61 (1985). No contract exists in Georgia unless the parties agree to all of its material terms and conditions and nothing is left to future agreement. *Pelletier v. Zweifel*, 921 F.2d 1465, 1503 (11th Cir.1991), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993).

 Viewing the evidence in a light most favorable to Dibrell, we believe a factual question remains as to whether a valid contract existed. Multiple documents may be read collectively to discern the elements and terms of a contract so long as there is no conflict between the documents. *Cassville White Assoc., Ltd. v. Bartow Assoc., Inc.*, 150 Ga.App. 561, 258 S.E.2d 175, 178 (1979). Reading the multiple faxes and telexes that were exchanged between BNL and Dibrell, we conclude that the terms of a contract to confirm Rafidain letters of credit are discernable.

On October 20, 1988, Dibrell proposed the essential terms of the contract in Crane's fax to von Wedel recounting their prior telephone conversation. This document was an offer by Dibrell for BNL to accept. A counteroffer was proposed by BNL in their October 25, 1988 fax agreeing to Dibrell's proposed terms, but noting that an additional negotiation fee would apply. *See Crystal Cubes of Stone Mountain, Inc. v. Kutz*, 201 Ga.App. 338, 411 S.E.2d 53, 55 (1991) (defining counteroffer). One of the material terms of this agreement, the amount, was altered by Dibrell in a new offer in their fax of November 1, 1988, informing BNL of the new amount of the sale; $4,162,500 rather

than the original $4,000,000. BNL accepted this new offer in their return fax of December 1, 1988, which stated "we agree that the amount of the letter of credit referenced in Paul von Wedel's letter to you now reads $4,162,500." (R.4–61 Ex. E.)

In the same document that contained BNL's acceptance of the new amount, BNL offered to confirm another letter of credit in an amount up to an additional $4,000,000. The offer also provided the fee BNL was to receive in exchange for its promise to confirm a second letter of credit. The offer appeared to be conditioned, however, only to cover shipments that would be made in January and February of 1989. Thus, on remand the district court should decide whether this was a material term of the agreement or whether BNL waived enforcement of this term so that a valid contract existed.

We recognize that there are a number of reasons why a bank would be reluctant to commit itself to confirm a letter of credit prior to the time the letter is issued. For one thing, the terms of the letter are important to a confirming bank. In this case, however, a fact finder could conclude that BNL had agreed to confirm prior to the issuance of the letter.

Viewing the evidence in a light most favorable to Dibrell, the following conclusions might be reached. When read collectively, the documents pertaining to the first sale reveal that both parties had a meeting of the minds on the essential terms of the contract and the documents themselves clearly express the terms agreed upon. Consideration existed in the form of mutual promises. Mutual promises to perform are sufficient consideration to support a contract in Georgia. *Advance Sec., Inc. v. Superior Surgical Mfg. Co.,* 197 Ga.App. 769, 399 S.E.2d 488, 490 (1990); *Randall v. Norton,* 192 Ga.App. 734, 386 S.E.2d 518, 520 (1989). Here, BNL promised Dibrell that it would confirm the Rafidain letters of credit that related to Dib-

rell's sales contract with SETC. In return, Dibrell promised BNL that it would pay BNL a set fee in exchange for BNL's confirmations.

A fact finder need not conclude that this was merely an agreement to agree, as BNL maintains. A fact finder could conclude that this was an agreement on BNL's part to perform after Dibrell had made the sale to SETC and Rafidain had issued a letter of credit. There was no more "agreement" to be made in the future; the essential terms of the confirmation were already agreed upon by the parties. BNL simply failed to perform after Dibrell relied upon the contract to confirm by entering a sales contract with SETC.

### C. ESTOPPEL CLAIM

The district court concluded that Dibrell did not have a separate cause of action for estoppel and therefore entered summary judgment for BNL on this claim. We agree with this conclusion. Under Georgia law, a plaintiff cannot assert a separate cause of action for estoppel. *Boral Bricks, Inc. v. Old South Transp. Management, Inc.,* 198 Ga.App. 678, 402 S.E.2d 777, 778 (1991). A plaintiff may use estoppel as an alternative means of providing consideration to support its contract claim. *See Folks, Inc. v. Dobbs,* 181 Ga.App. 311, 352 S.E.2d 212, 215 (1986). However, Dibrell did not use promissory estoppel as a consideration substitute, but rather asserted it as a separate cause of action. We affirm the district court's entry of summary judgment for BNL on this claim.[10]

### D. OTHER CLAIMS

Dibrell also asserts claims for negligence, fraud, and civil RICO. We find no error in the district court's analysis of these claims and conclude that further discussion is unwarranted. Thus, we affirm the district

---

10. We would be remiss if we did not note our suspicion that the contract may have been breached *before* Dibrell shipped the tobacco to SETC. Six months passed between Dibrell's initial request for the confirmation letter (January 16, 1989) and the date of its initial shipment under the first contract (June 23, 1989). If the contract was breached before Dibrell made its shipments, then Dibrell would be "bound to lessen the damages as far as is practicable by the use of ordinary care and diligence." *Leventhal v. Seiter,* 208 Ga.App. 158, 430 S.E.2d 378, 383 (1993) (quoting O.C.G.A. § 13–6–5 (1982)).

court's entry of summary judgment for BNL on these claims.

## V. CONCLUSION

We reverse the district court's entry of summary judgment on Dibrell's breach of contract claim and remand for further proceedings. We affirm the district court's entry of summary judgment on the negligence, fraud, civil RICO, and estoppel claims.

AFFIRMED in part, REVERSED in part and REMANDED.