[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14999
_____

D.C. Docket No. 1:09-cv-00832-TWT


WILLIAMS SERVICE GROUP, LLC,
as successor to Williams Service Group, Inc.,

                              Plaintiff - Counter Defendant -
                              Appellee - Cross Appellant,

               versus

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
ILLINOIS NATIONAL INSURANCE COMPANY,
BIRMINGHAM FIRE INSURANCE COMPANY,
INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,

                              Defendants - Counter Claimants -
                              Appellants - Cross Appellees,

Chartis Property Casualty Company,

                              Counter Claimant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(October 23, 2012)

Before TJOFLAT, CARNES, and JORDAN, Circuit Judges.

PER CURIAM:

This insurance dispute arises out of the breakdown of a complicated contractual relationship between Williams Service Group, LLC and four insurers: National Union Fire Insurance Company of Pittsburgh, Illinois National Insurance Company, Birmingham Fire Insurance Company, and Insurance Company of the State of Pennsylvania. Williams sued the insurers in Georgia state court alleging that they owe it more than $500,000. The insurers removed the case to federal district court and counterclaimed, alleging that Williams owes them over $2 million.

After discovery, Williams and the insurers filed cross motions for summary judgment. The district court entered a final order granting in part and denying in part each party's motion. The parties cross-appeal different parts of the district court's order.

2

I.

Between 1990 and 1997, Williams and the insurers entered into at least forty-five occurrence-based workers' compensation and general liability insurance policies, which we collectively refer to as the program agreements. The policies provided that the insurers would initially pay the entire cost of resolving any claims against Williams. Williams was then responsible for reimbursing the insurers for a self-insured retention, which is similar to a deductible, and for the administrative costs of investigating and defending claims. The program agreements required the insurers to bill Williams monthly for any amounts that Williams owed them. The agreements also required Williams to secure its payment obligations by giving the insurers a letter of credit. The insurers currently hold two clean, irrevocable letters of credit from Williams.[1] One of those letters is for $1 million, and the other is for $1.2 million. Neither letter has expired.

In 1995, Williams and the insurers entered into a buyout agreement that outlined what their obligations would be going forward for any claims made under the 1990–1995 policies. Williams paid the insurers $3.8 million, and the insurers

---

[1] To draw on a clean letter of credit, the beneficiary needs only to present the letter to the issuing bank. No other documentation is required. McCormack v. Citibank, N.A., 100 F.3d 532, 537–38 (8th Cir. 1996).

3

promised to pay up to $4.2 million for claims made against those policies. The insurers' payments reached that cap in February 1999, and they have now paid $1,850,572 over the cap. Williams has not reimbursed them for those payments, nor has it reimbursed them for $166,662 in administrative costs that the insurers incurred under the 1996–1997 policies.

The insurers did not send Williams monthly bills as the program agreements required. It was not until December 11, 2009, after Williams filed this lawsuit, that Williams received a bill for payments made over the buyout agreement's $4.2 million cap and the reimbursable administrative costs that had accrued under the 1996–1997 policies.

Williams sued the insurers in Georgia superior court in March 2009, seeking: (1) a declaratory judgment that the insurers owe it $548,471 in overpayments that Williams made under the 1996–1997 policies; (2) damages for a claim for recoupment; (3) damages for the insurers' negligent handling of a claim; and (4) a temporary restraining order to prevent the insurers from drawing on the letters of credit. The superior court granted the temporary restraining order. The insurers then removed the case to federal district court, and that court lifted the temporary restraining order. The insurers counterclaimed for breach of contract, seeking a declaration that: (1) Williams owes the insurers $1,850,572 for

4

claims paid over the $4.2 million cap in the 1995 buyout agreement and $166,662

for reimbursable administrative costs incurred under the 1996–1997 policies (a

total of $2,017,234), and (2) the insurers may draw on the letters of credit to

recover that entire amount. The district court granted in part and denied in part

both motions for summary judgment, awarding the insurers $530,088 for unpaid

reimbursements within six years of the date that the parties agreed to toll the

statute of limitations, but holding that the insurers' claims for unpaid

reimbursements before that date are time-barred and that the insurers may not

draw on the letters of credit to recover those amounts.

## II.

We review de novo a district court's summary judgment order, viewing the

evidence and drawing all inferences in favor of the nonmoving party. Chapter 7

Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1254 (11th Cir. 2012). Summary

judgment is appropriate only if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## A.

We begin by addressing the two issues that Williams raises in its appeal.

First, Williams contends that the insurers waived their right to collect on the

amounts Williams owes because they failed to send it monthly bills as the program

5

agreements required.  This argument itself fails because the program agreements contain a nonwaiver clause stating that a "failure . . . to enforce any and all of the provisions of this Agreement or to insist upon strict compliance by the other party shall not be construed as a waiver of any rights or privileges of the parties." Under that clause, the insurers did not waive their right to collect amounts owed under the program agreements by failing to enforce their right to reimbursement each month by sending a monthly bill.

Second, Williams contends that the insurers' failure to send it monthly bills was a material breach that excused Williams' performance under the program agreements.  Williams relies on Burnham v. Cooney, 593 S.E.2d 701 (Ga. Ct. App. 2004).  In that case, the contract between an attorney and his client required the attorney to bill the client monthly, which the attorney failed to do.  Id. at 704.  The court noted that there was evidence in the record that the client had told his attorney that he wanted to limit the cost of the litigation, had repeatedly requested bills in an attempt to do so, and might have ended the litigation had he known the amount of the attorney's fees that he was incurring.  Id.  For those reasons, the court held that a jury reasonably could find that the attorney's failure to send the client monthly bills was a material breach that excused the client's obligation to pay the attorney.  Id.  Williams argues that, as in the Burnham case, there is a jury

6

question here about whether the insurers' failure to send monthly bills is a material breach.

Williams' reliance on Burnham is misplaced.  There is no evidence that Williams asked for bills from the insurers so that it could monitor and manage its expenses.  Nor is there evidence that Williams would have, or even could have, ended its relationship with the insurers if they had sent monthly bills.  See General Steel, Inc. v. Delta Building Sys., Inc., 676 S.E.2d 451, 454, 455 n.16 (Ga. Ct. App. 2009) (holding that one party's failure to send monthly bills as required by a contract was not a material breach and distinguishing Burnham because in it, "there was evidence that [the] client repeatedly asked [the] lawyer for billing statements during the pendency of the litigation, but was not provided with any; that [the] client discovered during the litigation that the target defendant was judgment proof; that [the] client therefore told [the] lawyer that he did not want to spend a lot of money on the suit; and that [the] client would or might have withdrawn from the litigation, had he been billed periodically").  Here, the insurers' obligation to send monthly bills to Williams was merely incidental to the "main purpose" of the program agreements—namely, providing insurance coverage to Williams.  See id. at 455.  Their failure to send those bills was not a material breach that excuses Williams' reimbursement obligation.  See id.

7

Williams also argues that the insurers' obligation to send monthly bills is a condition precedent to its payment obligation under the program agreements. Nothing in the program agreements supports that argument. The program agreements do not use language such as "only if" or "if" or "on condition that" or "provided that" or any other words indicating that the parties intended a condition precedent. See id. at 454. Under Georgia law, conditions precedent are disfavored and a contractual provision is interpreted as a condition precedent only if it is clear that the parties intended it to operate that way. See id. at 454; Fulton Cnty. v. Collum Props., Inc., 388 S.E.2d 916, 918 (Ga. Ct. App. 1989); see also Ga. Code Ann. § 44-6-41. Because the program agreements do not indicate that the parties intended the monthly billing requirement to be a condition precedent to Williams' reimbursement obligation, we will not treat it as one.

## B.

We now turn to the issue that the insurers have raised in their cross-appeal. The district court concluded that the insurers' "right to draw on the letters of credit arises from the [p]rogram [a]greements, not the letters of credit themselves," and because an action to enforce the program agreements is time-barred under the statute of limitations, the statute of limitations prevents the insurers from drawing on the letters of credit. The insurers contend that the statute of limitations does

8

not bar them from drawing on the letters of credit. We agree.

The insurers' right to draw on the letters of credit is not dependent on their ability to successfully bring a breach of contract action under the program agreements. By their terms, the letters of credit are clean and unconditional—the insurers' right to draw on them is independent of the program agreements. See Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578–79 (11th Cir. 1994) (applying Georgia law) ("[T]he [bank's] obligation to the [insurers under a letter of credit] is independent of performance under the related contracts. The [bank] must honor the engagement to pay upon presentation of the proper documents regardless of the [insurers'] performance on the underlying contract. . . . [T]he [bank] is primarily liable and cannot assert defenses available to [Williams] that arise from a breach of the underlying contract."); see also McCormack v. Citibank, N.A., 100 F.3d 532, 537 (8th Cir. 1996) (explaining that to draw on a clean letter of credit, the holder "must merely demand payment; no documentation . . . is required").

The plain language of Georgia's statute of limitations indicates that it does not affect the ability of the insurers to draw on the letters of credit. It states, "All actions upon simple contracts in writing shall be brought within six years after the same become due and payable." Ga. Code Ann. § 9-3-24 (emphasis added). As

written, the statute operates to bar only judicial remedies—it does not affect the parties' substantive rights or bar non-judicial remedies. See Martin's Landing Found., Inc. v. Landing Lake Assocs., 707 F.2d 1329, 1331 (11th Cir. 1983) ("In Georgia, statutes of limitations bar the remedy sought by the plaintiff, not the substantive right."); Dixie Constr. Co. of Ga. v. Williams, 98 S.E.2d 582, 583 (Ga. Ct. App. 1957) ("Statutes of limitation look only to remedy and not to substantive rights. . . ."). Drawing on a letter of credit is not an "action" within the meaning of the Georgia statute of limitations. It is a non-judicial remedy. For that reason, the statute of limitations does not bar the insurers from drawing on the letters of credit. The district court erred in concluding that it does.

## IV.

We affirm the district court's summary judgment order insofar as it concluded that the insurers did not waive their right to collect the amounts Williams owes and insofar as it concluded that the insurers' failure to bill Williams monthly does not excuse Williams' reimbursement obligations under the program agreements. However, we vacate the district court's order to the extent that it concluded that Georgia's statute of limitations for actions to recover on a written contract bars the insurers from drawing on the letters of credit. The case is

remanded for proceedings consistent with this opinion.[2]

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

[2] Williams' briefs to this Court argue that the parties entered into a "collateral agreement" that allows the insurers to draw on the letters of credit for only those debts accruing under the 1996–1997 policies.  If that is true, then the insurers would breach the collateral agreement by drawing on the letters of credit to satisfy Williams' $1,850,572 debt for payments of claims under the 1990–1995 policies beyond the buyout agreement's $4.2 million cap.  Because the district court did not address this issue in its summary judgment order, we do not decide it here and instead leave it for the district court to decide in the first instance on remand.