**Reuben VAUGHN and Steven Davis, Plaintiffs,**

v.

**PRODUCERS AGRICULTURE INSURANCE COMPANY, Defendant.**

Case No. 1:14cv12–MW/GRJ.

United States District Court, N.D. Florida, Gainesville Division.

Signed Feb. 18, 2015.

William Kenneth Crispin, Law Office of William K. Crispin, Tavernier, FL, Michael David Martin, Michael D. Martin PA, Lakeland, FL, for Plaintiffs.

Christopher C. Hazelip, Cristine Marie Russell, Janet Caroline Owens, Rogers Towers PA, Jacksonville, FL, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MARK E. WALKER, District Judge.

This case concerns a dispute arising out of federally reinsured multi-peril crop insurance policies issued by Defendant Producers Agriculture Insurance Company ("ProAg") to the Plaintiffs, Reuben Vaughn and Steven Davis. Plaintiffs sued ProAg pursuant to section 624.155, Florida Statutes (2014), alleging that ProAg acted in bad faith when it denied, and failed to settle, Plaintiffs' insurance claims. Both parties have moved for summary judgment. This Court has considered the motions without hearing. As explained below, Plaintiffs' motion for partial summary judgment, ECF No. 32, is denied, while ProAg's motion for summary judgment, ECF No. 48, is granted.

## STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute is "genuine" if the record is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material" facts are those that might affect the outcome of the case under the governing substantive law. *Id.*

While this Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]nferences based upon speculation are not reasonable," *Solliday v. Fed. Officers*, 413 Fed.Appx. 206, 207 (11th Cir. 2011). Failure by the nonmoving party to

prove an essential element of its case, for which it has the burden of proof at trial, entitles the moving party to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

This order addresses two motions. The first is Plaintiffs' motion for partial summary judgment on three issues. ECF No. 32. Plaintiffs seek summary judgment on two issues regarding their section 20(i) claim. *Id.* at 2–3. Because this Court previously dismissed Plaintiffs' section 20(i) claim, ECF No. 43, summary judgment as it relates to that claim is denied as moot.[1] The remaining issue is whether ProAg timely responded to Plaintiffs' Civil Remedy Notices ("CRNs"), such that Plaintiffs are entitled to a presumption of bad faith. ECF No. 32 at 2.

ProAg has also moved for summary judgment on Plaintiffs' bad faith claim. ECF No. 48. ProAg claims that Plaintiffs' action is preempted or barred by federal regulations. *Id.* at 8. ProAg further contends that no reasonable juror could conclude bad faith from ProAg's dealings with Plaintiffs. *Id.* at 9. Lastly, ProAg maintains that Plaintiffs' alleged damages are highly speculative, rendering the bad faith claim deficient. *Id.*

## I. Plaintiffs' motion for partial summary judgment

Plaintiffs assert that an insurer's failure to respond to a CRN within sixty days entitles the claimant to a presumption of bad faith. Plaintiffs allege that the undisputed evidence in this case establishes that ProAg failed to respond to the notices

through the Florida Department of Financial Services' portal within sixty days. ECF No. 32 at 6. Accordingly, Plaintiffs claim entitlement to summary judgment on the resulting presumption.

ProAg, in response, maintains that Plaintiffs are not entitled to a presumption of bad faith. ECF No. 35. ProAg first claims that Plaintiffs' CRNs are invalid and that therefore failing to respond does not trigger the presumption of bad faith. *Id.* at 4. But even if the CRNs are valid, ProAg insists that a presumption of bad faith is unwarranted because it timely responded to the CRNs by exchanging various documents with Plaintiffs throughout the arbitration process that stated ProAg's response. *Id.* at 12–15. In the event such exchanges do not suffice, ProAg argues that the presumption is otherwise inapplicable. *Id.* Plaintiffs' primary retort is that the CRNs are not flawed and that, by failing to raise its objections with the Florida Department of Financial Services, ProAg has waived its objections.

This Court does not address the dispute over whether ProAg waived its objections and whether the CRNs are invalid. The only issue necessary to resolving Plaintiffs' motion is whether ProAg's timely, non-portal response suffices for purposes of responding to a notice under section 624.155.

### a. Facts [2]

Plaintiffs demanded arbitration on May 1, 2012, following ProAg's denial of their indemnity claims. ECF No. 1–6 at 3. On November 6, 2012, after the arbitration process had commenced, Plaintiffs filed their CRNs. *See* ECF No. 32–1 at 2, 5.

---

1. This Court does not construe this motion as requesting reconsideration of the dismissal because Plaintiffs moved for summary judgment on September 17, 2014, *before* this Court's order dismissing the section 20(i) claim. *See* ECF Nos. 32 & 43. Plaintiffs have not otherwise moved for reconsideration of that order.

2. These are the relevant facts in the light most favorable to ProAg, as the nonmoving party.

ProAg received the notices on November 16, 2012.[3]

In their notices, Plaintiffs advance various allegations concerning ProAg's purported bad faith failures. *See, e.g., id.* at 3. Plaintiffs also make several demands of ProAg, including that ProAg:

1. Completely abate ... demand of overpayment and have [Plaintiffs] removed from the FCIC ineligible tracking system list along with a statement by [ProAg] that [the] listing was [ProAg's] error. 2. Remit additional indemnity in the total amount due owed to [Plaintiffs] under [their claims]. 3. Reimburse [Plaintiffs] for all attorney fees and costs accruing and incurred as a result of [ProAg's] wrongful actions.... 4. Pay consequential damages incurred by [Plaintiffs] as a result of [ProAg's] wrongful violations in the amount of $500,000 and pay punitive damages to halt [ProAg's] general business practice that has impugned [Plaintiffs and their business] in the amount of $500,000.

*Id.* at 3–4. The notice states that it is given "in order to perfect the rights of the person(s) damaged to pursue civil remedies authorized by [s]ection 624.144, Florida Statutes." *Id.* at 2.

Although ProAg contests what constitutes "responding" to a CRN, it admits that it did not respond to Plaintiffs' CRNs "through the [Florida Department of Financial Services'] portal until February 21, 2014." ECF No. 35 at 14. It is undisputed, then, that ProAg's "portal" response occurred after the sixty-day period had run.

The parties engaged in arbitration after ProAg was served with the notices. As part of the proceedings, the parties ex-changed and submitted to the arbitrator various documents. *See, e.g., id.* at 13 (detailing some of the exchanges). These documents reflected the parties' positions as to the underlying claim. *See, e.g.,* ECF No. 35–3. It is undisputed that these exchanges took place within the sixty-day period. Accordingly, this Court finds that Plaintiffs were aware of ProAg's arguments on why the crop was uninsurable and that they became aware of ProAg's position within the sixty-day period. The problem is that ProAg did not respond through the portal.

### b. Response to the civil remedy notices

At issue is whether ProAg's response is sufficient for purposes of section 624.155 such that it precludes a presumption of bad faith. Plaintiffs insist that section 624.155 requires a response through the Florida Department of Financial Services. ProAg refutes that notion, arguing that "there is no requirement imposed by the [department] or Florida Statutes that an insurer's initial response to a civil remedy notice be via the [d]epartment's portal." ECF No. 35 at 14. Instead, ProAg maintains that it timely responded to the CRNs as part of litigating the insurance dispute through the arbitration process. *See id.* at 13–14.

■■■ A civil remedy notice is a condition precedent to bringing a bad faith claim under section 624.155. A claimant must file a notice with the Florida Department of Financial Services on a form provided by the department at least 60 days before filing a bad faith lawsuit. § 624.155(3)(a)–(b), Fla. Stat. The insurer can avoid an action for bad faith if, within

---

3. ProAg alleges that it was served with Plaintiffs' CRNs on November 8, 2012. ECF No. 35 at 3. The evidence submitted by Plaintiffs show that the notices were mailed on November 16, 2012. *See, e.g.,* ECF No. 32–1 at 8.

This Court assumes that Plaintiffs' date is correct, since it is more favorable to ProAg. In any event, it does not affect this Court's conclusion that Plaintiffs issued deficient CRNs.

sixty days of a claimant filing notice, "the damages are paid or the circumstances giving rise to the violation are corrected." § 624.155(3)(d), Fla. Stat. The statutory scheme, in other words, requires putative claimants to file notice to "give the insurer a final opportunity to settle an insured's claim and avoid unnecessary bad-faith litigation." *Rousso v. Liberty Surplus Ins. Corp.*, No. 10–CV–20554, 2010 WL 7367059, at *3 (S.D.Fla. Aug. 13, 2010).

The genesis of the timely response requirement is *Imhof v. Nationwide Mutual Insurance Co.*, where the Florida Supreme Court, addressing a different issue on review, first held that an insurer's failure to respond to a valid CRN within sixty days creates a "presumption of bad faith." 643 So.2d 617, 619 (Fla.1994). This presumption shifts to the insurer the burden of showing why it did not respond. *Id.*

In *Imhof*, the defendant—as the court highlighted—had not "responded in *any* way" to the claimant's notice. 643 So.2d at 619 (emphasis added). The court, troubled by the possibility that a defendant could insulate itself from liability "simply by refusing to respond to a notice of violation," developed the presumption of bad faith. *Id.*

It is clear that a desire to effectuate the policy behind section 624.155, which the *Imhof* court characterized as "promot[ing] quick resolution of insurance claims," underlies the court's decision. *Id.* The court explained, for example, that "when an insurer does not respond within sixty days, the insurer flouts the very purposes of section 624.155." *Id.* The bad faith presumption, then, was forged to incentivize prompt responses that in turn further the quick resolution of insurance claims.

The same concern that led to the presumption should serve as the touchstone for deciding what constitutes a "response" to a civil remedy notice under section 624.155. Information asymmetry, above all else, hinders pretrial settlement. Unveiling each side's position illuminates potential compromises. The earlier this occurs, the more time to strike a compromise.

■ This can be achieved so long as the parties engage in candid exchanges. Importantly, these candid exchanges are not exclusive to a specific medium, such as the Florida Department of Financial Services' portal. The sixty-day period in this case ticked over the course of a full blown arbitration proceeding. Within that period, the parties exchanged numerous documents and presented wide-ranging evidence supporting their respective positions. Plaintiffs unquestionably learned of ProAg's position as to the underlying insurance claim. Thus, ProAg's responses to Plaintiffs' allegations during the arbitration process had the same information-revealing effect—probably even greater—of a formal portal response.

This is not to say that all pre-suit proceedings constitute a "response" under section 624.155. This Court, however, need not delineate the precise boundaries of an adequate response because in this case ProAg's exchanges with Plaintiffs suffice. Accordingly, Plaintiffs are not entitled to summary judgment on the presumption of bad faith because ProAg timely responded to Plaintiffs' CRN.

## II. ProAg's motion for summary judgment

ProAg has moved for summary judgment on Plaintiffs' bad faith claim on several grounds, only one which is relevant to this order. ProAg maintains that Plaintiffs issued invalid CRNs, a condition precedent to bringing a bad faith claim under section 624.155. ECF No. 48 at 14. ProAg also asserts that Plaintiffs have not produced sufficient evidence from which a reasonable juror could conclude that

ProAg acted in bad faith. *Id.* at 14–21. Plaintiffs refute any notion that they issued deficient CRNs. Plaintiffs additionally contend that sufficient evidence exists from which a reasonable juror could find bad faith.

This Court only addresses whether Plaintiffs have presented sufficient evidence from which a reasonable juror could find that ProAg acted in bad faith when it denied the underlying insurance claims.

### a. Facts [4]

The Federal Crop Insurance Corporation ("FCIC"), through its operating entity, the Risk Management Agency ("RMA"), is the agency in charge of administering the federal crop insurance program. Under this program, FCIC reinsures crop insurances issued by certain approved insurance providers, such as ProAg. *See* ECF No. 1–6 at 4; *see also* ECF No. 43 at 3.

The FCIC promulgates "basic provisions," "crop provisions" and "special provisions of insurance" that constitute the common crop insurance policies issued by its approved insurance providers. *See* ECF No. 1–6 at 4. The Standard Reinsurance Agreement ("SRA") is the standardized template utilized by approved insurance providers issuing federally reinsured policies to producers of agricultural commodities. 7 C.F.R. § 400.164. The SRAs impose certain obligations on approved insurance providers, including requiring them to "follow all applicable [FCIC] procedures in its administration of the crop insurance policies reinsured." 7 C.F.R. § 400.168.

In the summer of 2010, ProAg issued multi-peril crop insurance policy numbers 12–987–770525 and 12–987–770842 to Vaughn and Davis, respectively. *See* ECF No. 48 at 2; ECF No. 52 at 4. The policy insured fresh cabbage for the 2011 crop year in Alachua County, Florida.[5] ECF No. 48 at 2. Processing cabbage is not insurable in Alachua County. ECF No. 1–6 at 4.

Although the policy does not provide a precise definition of "processing cabbage," it does differentiate between fresh cabbage and processing cabbage. The latter's distinguishing feature is cabbage "[p]lanted to be ... [g]rown and sold as processing cabbage *in accordance* with the requirements of a *processor contract* executed *on or before the acreage reporting date.*" U.S.D.A., *Cabbage Crop Insurance Provisions* ¶ 7(a)(4)(ii) (Apr.2009), ECF No. 1–3 at 31 (emphasis added).

On November 3, 2010, before planting the cabbage crop and before the acreage reporting date, Plaintiffs entered into a written contract with Great Lakes Kraut Company ("GLK"). ECF No. 48 at 2. Plaintiffs explain that the parties' intent behind the agreement "was for [GLK] to finance the [Plaintiffs'] four hundred acres of fresh market cabbage." ECF No. 52 at 5. This unequivocally is a hidden intent, since everyone agrees, including Plaintiffs, that the GLK agreement on its face is a processor contract.[6] *See* ECF No. 1–6 at 6 ("[Plaintiffs] acknowledge the contract

---

4. These are the relevant facts in the light most favorable to Plaintiffs, as the nonmoving parties.

5. The crop year is the anticipated period within which the insured crop is normally harvested, regardless of whether the subject crop is actually grown. *See* ECF No. 52 at 4 n. 6; *see also* ECF No. 1–6 at 2 n. 1.

6. Ryan Downs of GLK testified that the sauerkraut contract was meant as a financing doc-

ument. ECF No. 1–6 at 7. In his deposition, Downs stated that the sauerkraut contract was a "standard form used by [GLK]." ECF No. 52 at 6. At the time ProAg rejected Plaintiffs' claims, ProAg was not aware of this allegedly standard business practice. *Compare id.* (explaining that Downs' testimony occurred prior to the arbitration hearing), *with* ECF No. 48–1 at 28–33 (showing that ProAg rejected claims 2798 on September 16, 2011, 902 on October 26, 2011, and 1138 on January 24, 2012), *and* ECF No. 48 at 6

between [GLK] and [Plaintiffs] on its face appears to be a contract for the growing of processing cabbage . by [Plaintiffs] for [GLK]." (internal quotation marks omitted)); ECF No. 52 at 5 ("In a vacuum the agreement appears to be a contract for the growing of cabbage for later processing by [GLK].").

Plaintiffs planted their cabbage consistent with the "distinct cultural practices and expense[s]" associated with fresh cabbage. *See* ECF No. 52–19 at 25–27.[7] They then filed their U.S.D.A./Farm Service Agency ("FSA") acreage reports, in which Plaintiffs certified that they planted fresh market cabbage. ECF No. 52 at 6. David Spaulding, their insurance agent

representing ProAg, transferred the information from the FSA forms to ProAg's acreage report forms, certifying the crop as fresh market crop. *Id.* at 7.

A freeze occurred in December 2010 that led Vaughn to file a Notice of Loss ("NOL") as to 80 acres' worth of cabbage crop (claim # 1138) and Davis to file a NOL for cabbage crop on 51.6 of his acres (claim # 902). *See* ECF No. 1–6 at 2. ProAg adjusted Plaintiffs' claims arising out of the December 2010 freeze. *See* ECF No. 48 at 2–3. As part of the adjustment, ProAg relied on the representations made by Plaintiffs in their acreage reports and on the inspections performed by ProAg's adjusters.[8] *See id.* ProAg ap-

---

(noting that Plaintiffs demanded arbitration on May 1, 2012).

**7.** This is genuinely disputed. The arbitrator, for example, found that the farming practices used by Plaintiffs indicated that they had planted fresh cabbage. *See* ECF No. 1–6 at 8–9. On the other hand, in a letter to the RMA in which counsel for Plaintiffs tried to convince the agency to adopt their interpretation of the policy, counsel for RMA posited that one of the reasons supporting Plaintiffs' position was that "cabbage grown for fresh cabbage is the *exact same* as the cabbage grown for processing. *Same cultural practices,* same cabbage variety type as prescribed under the applicable Special Provisions, same planting periods, etc." ECF No. 48–3 at 7 (emphasis added). This is not a material, however, since resolving this dispute in favor of Plaintiffs still yields the same result; namely, summary judgment for ProAg.

**8.** ProAg conducted several inspections of · Plaintiffs' farms. Generally, they fall into two categories: adjustments and Growing Season Inspections. The adjustments arose from Plaintiffs' various insurance claims and were completed before a loss was indemnified. Growing Season Inspections are not directly related to any insurance claim. Rather, ProAg selects the policies subject to these inspections, which take place over the course of a growing season. Growing Season Inspections are comprehensive reviews of crops. As part of their final report, inspectors

verify that the subject farms were planted "as reported to FSA." ECF No. 52–8.

In this case, ProAg informed Plaintiffs that their policies had been selected for Growing Season Inspections on February 17, 2011. *See* ECF No. 52–7. The inspectors eventually verified that Plaintiffs' farms were planted as reported to FSA. *See* ECF No. 52–8. Thus, ProAg inspectors at one point verified that the crops in question were planted as fresh market cabbage. Plaintiffs cite this as evidence that ProAg's hierarchy ignored their own inspectors' findings and acted in bad faith. *See* ECF No. 52 at 7–8.

ProAg does not cotton to this characterization. ProAg contends that the inspections are immaterial to the bad faith claims. ECF No. 55 at 8. First, ProAg explains that by the time the inspection notices were sent, ProAg had already adjusted Plaintiffs' December 2010 losses. *Id.* The farm area that froze was thereafter "released to be replanted." *Id.* No inspection had yet taken place. Accordingly, any subsequent Growing Season Inspection— even one that verified the crops as fresh market cabbage—would not be determinative of whether the *initial* crops that froze in December 2010 were fresh market cabbage.

As for the February 2011 loss, ProAg reiterates their chief argument. ProAg alleges that the Growing Season Inspection reports were all completed prior to ProAg's discovery of the GLK contract, which no one disputes is processor contract. *Id.* Since processing cabbage is defined as cabbage grown in accordance with a processor contract, ProAg rea-

proved and paid the claims on March 15, 2011. ECF No. 1–6.

A second freeze occurred in February 2011. ECF No. 48 at 3. Consequently, on April 6, 2011, Davis filed another NOL (claim # 2798) as to 17.3 acres of crop. *Id.*

ProAg first received a copy of the GLK contract on June 23, 2011, after it had adjusted and paid claims 1138 and 902. ECF No. 48 at 3; *see also* ECF No. 48–1 at 3. As a result, ProAg, through its compliance reviewer Ted Poehler, denied claim 2798 on September 16, 2011.[9] *See* ECF No. 48–1 at 28 (explaining to Davis that his "cabbage crop was sold as processing cabbage and is not insurable"). ProAg invited Davis to provide information that he felt would support his contention that the crop insurable. *Id.; see also* 7 C.F.R. §§ 457.8(14)(e)(2)–(4) (requiring Plaintiffs to provide ProAg with all information necessary to settle a claim).

Davis' attorney responded on October 26, 2011. *See* ECF No. 52–12. The response may be divided into three parts. First, Davis' attorney requested that ProAg provide information as to how it learned that Davis' cabbage was sold as processing cabbage. *Id.* at 2. Second, the letter asked ProAg to forward Davis' counsel the policy's definition of "fresh market cabbage" and "processing cabbage" to "eliminate any confusion."[10] *Id.*

Lastly, Davis' counsel provided several reasons in support of the finding the cabbage insurable. *See id.* Some reasons, for example, relate to the farming practice employed by Davis, such as that the cabbage was grown to grade "U.S. Commercial or better." *Id.* at 2. Other reasons justified why Davis eventually sold the cabbage as processing cabbage. *Id.* at 3 ("Field observations by . . . your adjuster(s) all determined that the damaged cabbage heads were too small to make U.S. [sic] Commercial Grade and therefore not worthwhile to harvest for fresh market."). Importantly, there is no mention of the GLK contract.

ProAg replied to Davis' counsel that very same day. *See* ECF No. 52–13. ProAg rejected Davis' arguments and reit-

---

sons that this integral piece of evidence "had fundamental implications for the insurability of Plaintiffs' cabbage." *Id.* Stated differently, ProAg effectively argues that the inspections are meaningless on the issue of whether the cabbage was planted as processing cabbage since processing cabbage, by definition, requires the existence of a processor contract. Inspectors cannot determine the existence of such a contract by looking at the fields.

Moreover, ProAg maintains that Plaintiffs have presented no evidence indicating that ProAg ignored "the fact that ProAg inspectors confirmed that Plaintiffs did indeed plant cabbage . . . as they reported to the FSA." *Id.* at 9. ProAg contends that even after considering its inspectors' reports, the discovery of the GLK contract raised a reasonable question about Plaintiffs' intent in planting their cabbage. *Id.*

In light of this evidence, this Court finds that Plaintiffs overstate the impact of the inspections on ProAg's decision to deny Plaintiffs' claims. The General Season Inspec-

tions, as ProAg explains, either occurred outside the relevant scope in which ProAg made its decision, or proved irrelevant in light of the definition of "processing cabbage."

9. ProAg denied claim 2798, which arose from the February 2011 freeze, on September 16, 2011; claim 902 on October 26, 2011; and claim 1138 on January 24, 2012. *See* ECF No. 48–1 at 28–33. The bases for denial are the same.

10. There should not have been any confusion. The Cabbage Crop Insurance Provisions define the terms. Plaintiffs are presumed to have knowledge of the content of the agreements to which they assent. *See Sabin v. Lowe's of Florida, Inc.,* 404 So.2d 772, 773 (Fla. 5th DCA 1981); *see also* 31B Fla. Jur.2d *Insurance* § 3588 ("In the absence of fraud, accident, or mistake, parties to an insurance contract are conclusively presumed to know and understand the terms and contents of their contract . . . .").

erated its position that the disputed cabbage "is and always was intended and marketed as processing cabbage." *Id.* at 3. In light of this disagreement, ProAg advised Davis of the policy's mediation and arbitration procedures, and invited Davis to submit further documentation. *Id.* ProAg sent Vaughn virtually identical letters. *See* ECF No. 52 at 9; *see also* ECF No. 48–1 at 28–30.

Roughly a week later, on November 2, 2011, ProAg formally reported to the RMA that they suspected Plaintiffs had misrepresented information. *See* ECF No. 52–14 at 2. ProAg asserts that it was obligated to do so under the 2011 SRA. ECF No. 48 at 5. Appendix IV to the 2011 SRA provides, in pertinent part: "In all cases where [ProAg] or its affiliates reasonably suspect misrepresentation, fraud, waste, or abuse, [ProAg] shall ... Immediately report such cases to FCIC."

This report partly triggered an investigation by RMA.[11] The RMA subsequently concluded, in two reports issued in February and March 2012, that Plaintiffs planted processing cabbage. *See* ECF No. 11–6 at 2, 40. The RMA compliance officer assigned to the case, like ProAg, determined that the cabbage was processing cabbage principally because of the GLK contract.[12] *See* ECF No. 1–6 at 11. He does not seem to have had any information about how the cabbage crop was actually planted in the field. *Id.*

Ultimately, ProAg found Plaintiffs' cabbage uninsurable. RMA did too. ProAg therefore rejected claim 2798 and demanded reimbursement of the indemnities. paid on claims 1138 and 902. ECF No. 48 at 5. Plaintiffs failed to repay the indemnities. *Id.*

Because of Plaintiffs' failure to repay the indemnities, RMA's Reinsurance Accounting and Eligibility Tracking Branch placed them on the ITS list. *See* ECF No. 52–1. While Plaintiffs could appeal their inclusion in the ITS list directly with the U.S.D.A., RMA instructed Plaintiffs that disputes concerning the underlying indebtedness had to be made in accordance with the terms of the insurance policy. *Id.* at 2.

Plaintiffs demanded arbitration on May 1, 2012. ECF No. 52 at 10. On January 31, 2013, the arbitrator found in favor of Plaintiffs, holding that they had intended to plant fresh market cabbage and that, therefore, the cabbage was insured.

### b. Bad faith

■■ The issue is whether ProAg did not attempt in good faith to settle Plaintiffs' insurance claims when, under all the circumstances, it could and should have done so. § 624.155(1)(b), Fla. Stat.; *see also State Farm Mut. Auto. Ins. Co. v. Laforet,* 658 So.2d 55, 62 (Fla.1995) (adopting the standard set forth in section 624.155). An insurer that denies payment on a claim is not guilty of bad faith as a

---

11. The reports from RMA's Eastern Regional Compliance Office state that RMA's review "was prompted by *both* an *internal* data mining discovery and a coinciding report from ProAg suggesting possible misrepresentation ... relating to [Plaintiffs'] cabbage policy and claim." ECF No. 11–6 at 45. The fact that an internal review independently prompted RMA's investigation supports the conclusion that ProAg acted reasonably when it reported Plaintiffs.

12. Although not, as Plaintiffs insist, solely because the GLK contract was *styled* a pro-

cessor contract. As this Court will elaborate later, RMA also based its decision on the terms of the agreement and overall deal structure. For example, RMA computed the contract sales price and determined that the agreement yielded a price per hundredweight of cabbage *below* the established price for fresh market cabbage in Alachua County. *See, e.g.,* ECF No. 11–6 at 6. It also yielded a price below the price listed by Plaintiffs in their FCIC Policyholder Information Report. *Id.* Thus, the fact that the agreement was labeled a processor contract was not dispositive.

matter of law. *Vest v. Travelers Ins. Co.,* 753 So.2d 1270, 1275 (Fla.2000). Rather, "[t]he insurer has a right to deny claims that it in good faith believes are not owed on a policy." *Id.* A good faith denial precludes liability "[e]ven when it is later determined by a court or arbitration that the insurer[ ] ... was mistaken."[13] *Id.*

While this Court recognizes that bad faith "decisions depend upon various attendant circumstances and usually are issues of fact to be determined by a factfinder," *id.,* this Court nevertheless finds that there is insufficient evidence from which a reasonable juror could determine that ProAg acted in bad faith. This Court recognizes that the ultimate question is one of reasonableness viewed in the totality. For clarity, however, this Court parses out ProAg's response.

Viewing ProAg's settlement interactions with Plaintiffs on a timeline, no reasonable juror could conclude from the evidence that ProAg acted in bad faith when it initially denied Plaintiffs' claims; followed-up with an investigation; reported Plaintiffs to the RMA after Plaintiffs failed to address ProAg's concerns; and continued refusing to pay the claims once RMA also determined that Plaintiffs planted processing cabbage.

■ First, no reasonable juror could conclude from the undisputed evidence

that ProAg's initial denial of Plaintiffs' claims, and its demand for repayment of the indemnities paid on the December 2010 freeze, was in bad faith. ProAg first denied Plaintiffs' claims because of the GLK contract. While Plaintiffs admit that the GLK contract constitutes a processor contract, Plaintiffs insist that rejecting the insurance claims entirely on that basis was unjustified because ProAg had complete knowledge of facts indicating that Plaintiffs had planted fresh market cabbage.

Plaintiffs allege, for example, that they employed practices distinctly used for growing fresh market cabbage, such as planting their cabbages in tight spaces, which produces a smaller cabbage head consistent with fresh market cabbage. ECF No. 1–6 at 8; *see also* ECF No. 52 at 24. ProAg purportedly knew of these practices through their adjusters. Plaintiffs also point to other details, such as the FSA acreage reports indicating that Plaintiffs were growing fresh market cabbage. Because the collective weight of the evidence allegedly indicated that the cabbage in question was fresh market cabbage, Plaintiffs contend that ProAg acted in bad faith when it concluded otherwise and rejected Plaintiffs' claims.

Plaintiffs' attempt to diminish the significance of the GLK contract is unavailing. The existence of a processor contract is

**13.** The arbitrator sided with Plaintiffs in the underlying insurance dispute. The arbitrator explained that "while the contracting process between the [Plaintiffs] and GLK was sloppy and is sufficient upon discovery by ProAg to give rise to further inquiry, it is an insufficient basis upon which to deny the subject claims." ECF No. 1–6 at 11. Instead, "[t]he intent of the [Plaintiffs] is more clearly shown by the cultural practices in planting the crop." *Id.* Those practices convinced the arbitrator that Plaintiffs intended to plant fresh market cabbage.

There are important differences, however, between the question that the arbitrator was

tasked with answering and what this Court addresses at summary judgment. The arbitrator answered the ultimate question of whether the crop planted by Plaintiffs was in fact insurable. By contrast, this bad faith action focuses on the actions taken by ProAg, considering all of the circumstances known to it, at the time such actions were taken. This difference modifies the importance of some facts. It is much less relevant, for example, that Plaintiffs can now explain why the ostensible processor contract is not actually a processor contract if that explanation was never communicated to ProAg at the time it denied the insurance claims.

the sine qua non of processing cabbage. The regulations—to which the entire policy is subject—are unambiguous on this point. _See_ U.S.D.A., _Cabbage Crop Insurance Provisions_ ¶ 7(a)(4)(ii) (Apr.2009), ECF No. 1–3 at 31. While information regarding the farming practices employed by Plaintiffs is circumstantial evidence of the intended crop, the processor contract amounts to a proverbial smoking gun. As even the arbitrator concluded, the GLK contract alone was sufficient to create a reasonable suspicion that Plaintiffs had misrepresented their crop.

Second, no reasonable juror could find that ProAg acted in bad faith by investigating Plaintiffs' claim and requesting proof that Plaintiffs planted fresh cabbage. The undisputed evidence shows that, after discovering the GLK contract, ProAg sent Plaintiffs a letter accusing Plaintiffs of planting processing cabbage and seeking further information on the matter. _See_ ECF No. 48–1 at 28. Counsel for Davis responded. Importantly, the letter drafted by Davis' counsel focused on the circumstantial evidence indicating that Plaintiffs had planted fresh market cabbage, but did _not_ address the GLK contract. _See_ ECF No. 52–12.

The fact that Plaintiffs' counsel failed to mention the GLK contract is significant. The GLK contract committed Plaintiffs to planting processing cabbage. If Plaintiffs did plant their cabbage in accordance with the GLK contract, their crops would be, by definition, processing cabbage.

Plaintiffs should have known that the GLK contract, which they had neglected to tell ProAg about, could raise questions regarding the insurability of their crop. Rather than confronting the GLK contract directly, Plaintiffs relied on circumstantial evidence. ProAg, for example, had reports verifying that Plaintiffs planted fresh market cabbage. But these reports are rather meaningless without the GLK contract because without it the adjusters could not possibly have known whether the crop was planted in accordance with that contract's terms.

Third, in light of Plaintiffs' failure to contest this crucial piece of evidence, no reasonable juror could find that ProAg acted in bad faith when it reported Plaintiffs to the RMA. Not surprisingly, Plaintiffs disagree, chiding ProAg for reporting them. They cite this as evidence of bad faith. Specifically, Plaintiffs accuse ProAg of failing to conduct a thorough enough investigation and of hastily initiating adverse proceedings. ProAg contends that it was required to do so under FCIC regulations and that adhering to such obligations cannot be bad faith as a matter of law. In their response to ProAg's motion for summary judgment, Plaintiffs lambaste ProAg for relying on its obligations to the RMA, "its phantom party," as a defense. ECF No. 52 at 20.

■ Contrary to Plaintiffs' argument, however, ProAg's actions must be considered in context. "To determine whether there was an obligation by the insurer to pay, a court must look to the underlying policy to determine the obligation of the parties and to determine whether there was bad faith in the handling of the claims." _316, Inc. v. Maryland Cas. Co.,_ 625 F.Supp.2d 1187, 1192 (N.D.Fla.2008) (Smoak, J.).

Even a superficial review of the underlying policy reveals that the federally reinsured crop insurance business is highly regulated. The insurance policy, for example, is drafted by the RMA and issued pursuant to the Federal Crop Insurance Act, 7 U.S.C. §§ 1501–1524. The terms of the policy make it clear that the parties' rights and obligations are subject to the FCIC's policies and procedures. _See, e.g.,_ Preamble to the Common Crop Insurance Policy, 7 C.F.R. § 457.8 (explaining that

the parties will use the procedures issued by FCIC in the administration of the policy). Knowledge of these policies and procedures is imputed to both parties. *See, e.g., Cain Field Nursery v. Farmers Crop Ins. Alliance, Inc.,* No. 4:09–CV–78, 2012 WL 1286657, at *10 (E.D.Tenn. Apr. 13, 2012) ("Plaintiffs are charged with knowledge of the applicable regulations when dealing with the government (and a government sponsored program such as crop insurance)."). Thus, Plaintiffs' argument that ProAg's obligations to FCIC do not matter is wrong because the policy itself expressly incorporates the regulations promulgated by the FCIC.

ProAg had an obligation to "immediately report" Plaintiffs to the RMA if it "reasonably suspect[ed] misrepresentation, fraud, waste, or abuse." U.S.D.A, *2011 Standard Reinsurance Agreement—Appendix IV* § IV (June 30, 2010). ProAg arguably had sufficient evidence—the GLK contract—to report Plaintiffs in June but nevertheless waited until November. There does not even seem to be a notice requirement in section IV, yet ProAg refrained from reporting Plaintiffs until after it received an explanation from Plaintiffs.[14] This expla-

nation—it is worth reiterating—failed to address the GLK contract.

Reporting Plaintiffs to the RMA triggered an investigation that stripped ProAg of the power to settle the claim—that is, pay the indemnity—without RMA approval. *See id.* (prohibiting ProAg from taking any action without FCIC approval). ProAg simply could not pay the claims while RMA conducted its investigations.

Had RMA resolved the investigation in Plaintiffs' favor, continued refusal to settle could probably be characterized as bad faith. But RMA determined that Plaintiffs were guilty of misrepresentation.[15] After this determination, the only recourse left for Plaintiffs was arbitration. Given these limitations, no reasonable juror could find that ProAg acted in bad faith by refusing to pay the claims while RMA investigated the matter and after RMA determined that Plaintiffs had misrepresented the crop.

In conclusion, the crux of Plaintiffs' argument is that an insurer acts in bad faith when it disputes payment even though it holds nearly conclusive evidence supporting its position. Under Plaintiffs' theory,

---

**14.** As previously explained, the undisputed evidence shows that RMA would have investigated Plaintiffs even had ProAg not reported them. *See* ECF No. 11–6 at 45.

**15.** The RMA's decision turned on several findings. RMA first held that the GLK contract constituted a processor contract and that, by planting their cabbage in accordance with it, Plaintiffs planted processing cabbage. *See* ECF No. 11–6 at 5. RMA then went further and explained that "[e]ven if [GLK] was not a cabbage processor," the "agreed upon sales price" of the cabbage was below the price established by the RMA for all fresh cabbage insurable in Alachua County. *Id.* at 6. Moreover, the "funds [GLK] paid [Plaintiffs] to care for the crop" were only 69% of the established 2011 fresh price. *Id.* at 7. Finally, RMA pointed to other components of the GLK contract, such as a representation that the

contract was entered into with the intent to "make first class sauerkraut," as evidence that Plaintiffs planted processing cabbage. *Id.*

Despite Plaintiffs' accusations that RMA reached its conclusion solely by reviewing the GLK contract and without performing any "ground truth investigation," RMA's decision was not only based on the fact that the GLK contract was styled a processor contract. RMA also relied on other evidence, such as pricing, in determining that Plaintiffs planted processing cabbage. This is an important point because Plaintiffs allege that the GLK contract, although it looked like a processor contract, was nothing more than a financing agreement. But even if true—that is, even if the only "real" terms were the prices—RMA found that the pricing was inconsistent with growing fresh cabbage.

to have acted in good faith, ProAg effectively would have had to disregard the regulatory definition of processing cabbage. Indeed, since Plaintiffs never bothered to address the GLK contract directly, ProAg would have had to ignore the *sole defining element* of "processing cabbage." Additionally, Plaintiffs would also have had ProAg disobey its reporting obligations, even though regulations unequivocally obligated ProAg to report its suspicions to the RMA immediately. Finally, after RMA confirmed ProAg's suspicions, ProAg could no longer settle Plaintiffs' claims without acting unlawfully.

This Court holds that a reasonable juror considering all of the circumstances could not find that ProAg failed to settle Plaintiffs' claim in good faith.

For these reasons,

**IT IS ORDERED:**

1. Plaintiffs' motion for partial summary judgment, ECF No. 32, is **DENIED.**

2. ProAg's motion for summary judgment, ECF No. 48, is **GRANTED.** The Clerk shall enter judgment stating: "All claims against Defendant Producers Agriculture Insurance Company are **DISMISSED with prejudice."** The Clerk shall close the file.