**Ethel COUSIN, Plaintiff,**

v.

**GEICO GENERAL INSURANCE COMPANY, Defendant.**

Case No. 3:14–cv–397–J–39JRK

United States District Court, M.D. Florida, **Jacksonville Division.**

Signed December 15, 2015

Michael S. Rywant, Kerry C. McGuinn, Jr., Rywant, Alvarez, Jones, Russo & Guyton PA, Gainesville, FL, Michael D. Marrese, Morgan & Morgan, PA, Jacksonville, FL, for Plaintiff.

Amanda L. Kidd, Stephanie Ann McQueen, Young, Bill, Roumbos & Boles, PA, Pensacola, FL, B. Richard Young, Young, Bill, Roumbos & Boles, PA, Miami, FL, for Defendant.

## ORDER

BRIAN J. DAVIS, United States District Judge.

**THIS CAUSE** is before the Court on Defendant GEICO General Insurance Company's ("GEICO") Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 53) and Plaintiff Ethel Cousin's response in opposition (Doc. 66).

## I. BACKGROUND [1]

On June 12, 2009, Ms. Cousin and her husband were involved in a traffic accident (the "accident") when Helen Bratcher made a left turn in front of the Cousins' vehicle.[2] (Doc. 58.1). Ms. Bratcher was found to be at fault for the accident and she was cited for careless driving. (*Id.*). It is undisputed that both drivers were insured by GEICO. On the same day of the accident GEICO was notified that Ms. Cousin sustained a fractured leg, as well as injuries to her knee, neck, and shoulder, and that an ambulance transported Ms. Cousin to the hospital. (Doc. 58.7 at 19). By June 15, 2009, GEICO conducted interviews with the Cousins verifying that both had sustained injuries. (*Id.* at 17–18). The interview of Ms. Cousin revealed that she was suffering from neck, back, chest, knee, feet, wrist, and arm pain, and that she was losing wages from her job as a certified nursing assistant. (*Id.* at 18).

On June 29, 2009, attorney Michael Marrese began representing Ms. Cousin in her efforts to recover for injuries she sustained in the accident. (Doc. 58.8). On July 27, 2009, GEICO notified Ms. Cousin that it assigned Kimberly Stephens to handle Ms. Cousin's UM claim and asked for an update regarding the "injury and treatment status" of Ms. Cousin. (Doc. 58.10).[3] On August 3, 2009, the adjuster assigned to Ms. Cousin's bodily injury ("BI") claim against Ms. Bratcher notified Ms. Stephens that GEICO tendered the full $10,000.00 available under Ms. Bratcher's policy to Ms. Cousin because of Ms. Cousin's "Displaced Spiral Fx [fracture] Of The Tibia."[4] (Doc. 58.6 at 26). On August 10, 2009, Ms. Cousin also notified Ms. Stephens that she received a check for $10,000.00 from Ms. Bratcher's insurance and demanded payment of the full $100,000.00 available under Ms. Cousin's UM policy. (Doc. 58.11).

Ms. Cousin attached copies of various medical records with her demand. (Docs.58.11–58.18). Among the records was a Patient Assessment form completed by Medwell Medical Center ("Medwell") on June 25, 2009, which described Ms. Cousin as experiencing pain in her neck, hand, and foot with levels of pain high enough that it interfered with her ability to work and sleep.[5] (Doc. 58.14 at 5). After completing its evaluation, Medwell

---

1. "[W]hat is considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes." *Sims v. Leonard,* 465 Fed.Appx. 869, 870 (11th Cir.2012) (quoting *Cottrell v. Caldwell,* 85 F.3d 1480, 1486 (11th Cir.1996)) (alteration in original).

2. GEICO paid the full amount of the underinsured/uninsured motorist ("UM") policy limits to Mr. Cousin and he is not a part of this case.

3. Section 627.727(1), Florida Statutes, provides that uninsured motorist coverage "is

provided ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury."

4. In contrast to UM coverage, bodily injury coverage is designed to protect the insured from claims of damage made against the insured. *See Johnson v. Geico Gen. Ins. Co.,* 318 Fed.Appx. 847 (11th Cir.2009).

5. On a scale of 0–10, Ms. Cousin's pain was described as a 9.

diagnosed Ms. Cousin with a neck sprain and spiral fracture of the right tibia. (*Id.* at 6). Medwell then recommended that (1) Ms. Cousin undergo two to three weeks of, among other things, physical therapy and electrical stimulation therapy and (2) referred Ms. Cousin to see an orthopedic specialist (Doc. 58.13 at 5). Between July 8 and July 10, 2009, Ms. Cousin underwent a series of x-rays on her hip, wrist elbow, and lumbar and thoracic spine, which only showed scoliosis and mild degenerative disc disease of her thoracic spine. (Doc. 58.18).

Also among the medical records Ms. Cousin provided GEICO was a July 20, 2009 follow-up evaluation by Medwell, which reported that Ms. Cousin was experiencing cervical, lumbar, hip, elbow, and ankle pain. (Doc. 58.15 at 4). Ms. Cousin rated the severity of her cervical and lumbar pain at a 6 and 7, respectively. (*Id.*). The evaluation recommended another three to four weeks of physical therapy in hopes of improving Ms. Cousin's pain, posture, strength, and range of motion. (*Id.* at 5).

Simultaneous to Ms. Cousin's demand letter to GEICO for the full amount available under the UM policy, Ms. Cousin filed her first Civil Remedy Notice of Insurer Violations (Doc. 58.19; 8/10/09 "First CRN"). The First CRN accused GEICO of violating Florida Statute section 524.155(1)(b)(1), which provides a cause of action where an insurer fails "in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests[.]" Ms. Stephens responded to Ms. Cousin's initial demand letter by confirming receipt of the initial demand letter and that GEICO would contact Ms. Cousin after evaluation of the claim. (Doc. 58.20; 8/17/09 Response). Two days later, Ms. Cousin sent additional medical records which included some medical records pre-dating the accident. (Doc. 58.21). Of note, the additional medical records showed that Ms. Cousin had testing on her lumbar on February 9, 2007, which showed mild broad lumbar dextroscoliosis. (*Id.* at 7). The additional medical records also showed that she underwent further testing on her lumbar following the accident, which showed degenerative disc and joint disease, but no acute findings. (*Id.* at 4).

On August 26, 2009, GEICO completed review of Ms. Cousin's UM claim, and GEICO decided that the information available to them at the time was "[l]imited" and that it needed personal injury protection ("pip") logs and all billing information. (Doc. 58.6 at 8). The following day, Ms. Stephens informed Ms. Cousin that GEICO was considering Ms. Cousin's UM claim and that GEICO needed pips logs and documentation of any lost wages to complete its evaluation. (*Id.* at 7). Again, on September 9, 2009, Ms. Stephens advised Ms. Cousin that her claim remained under consideration and that GEICO was in need of pip logs and lost wage information. (Doc. 58.22). On September 29, 2009, GEICO again requested all of Ms. Cousin's medical records and bills related to the accident so it could make a determination on her UM claim. (Doc. 58.23 at 2). During a phone conversation on the same day, GEICO again asked for all of Ms. Cousin's medical records and bills. (Doc. 58.5 at 33–34). Ms. Cousin advised that she was undergoing treatment and would update GEICO as to her status in a week or so. (*Id.* at 34).

Ms. Cousin followed-up with GEICO on October 5, 2009, by sending a letter that informed GEICO that her fractured tibia received a positive prognosis and was healing well. (Doc. 58.24; 10/5/2009 Letter). That same letter also informed GEICO that Ms. Cousin was still experiencing "tremendous" back pain for which she un-

derwent two epidural injections to her lumbar spine with a third scheduled in the immediate future. (*Id.*). Attached to the letter was the report from an August 10, 2009 MRI of Ms. Cousin's lumbar, which showed a mild annular disc bulge, eccentric disc bulge, mild central canal stenosis, and small central disc protrusion. (Doc. 58.24 at 64).

The letter also advised GEICO that Ms. Cousin informally met with her husband's neurosurgeon Dr. Gomes at one of her husband's appointments. Ms. Cousin claimed that as a courtesy, Dr. Gomes reviewed her MRI films, which she happened to have with her at the time. After review of her MRI films, Dr. Gomes asked that Ms. Cousin make an appointment with him because he thought that Ms. Cousin could very likely be a good candidate for a lumbar fusion procedure, given that the epidural injections were not providing the desired relief. (*Id.* at 1). Ms. Cousin did not provide any notes from Dr. Gomes regarding his opinion on Ms. Cousin's lumbar.

Ms. Cousin also attached additional medical records regarding her past medical treatment to her letter (e.g., 58.24 at 3), but Ms. Cousin failed to provide the previously requested pip logs or lost wage information. On October 7, 2009, Ms. Cousin provided GEICO with a letter confirming that she had an October 29, 2009 appointment with Dr. Gomes. (Doc. 58.25). GEICO replied on October 8, 2009, that it received the 10/5/2009 Letter regarding Ms. Cousin's past treatment, but noted that Ms. Cousin had only provided one medical bill for $135.00 with no pip log, no recommendation for surgery, and no lost wage documentation. (Doc. 58.26). Based on the lack of quantifiable damages to Ms. Cousin and the $10,000.00 BI benefits already paid, GEICO offered $5,135.00 to resolve Ms. Cousin's UM claim. (*Id.*). GEICO also requested MRI films of Ms. Cousin's lumbar to allow GEICO to conduct an independent medical evaluation ("IME"). (*Id.*).

On October 12, 2009, Ms. Cousin provided medical bills of $11,882.00 and lost wages of approximately $2,000.00. (Doc. 58.5 at 26). On the same day, Ms. Cousin filed her second Civil Remedy Notice of Insurer Violations, wherein she alleged that GEICO failed to offer timely a reasonable offer to settle her UM claim "despite [GEICO] being presented with documentation supporting a very serious set of injuries...." (Doc. 58.27; 10/12/09 "Second CRN"). On October 21, 2009, GEICO responded by scheduling Ms. Cousin for an IME on November 2, 2009. (Doc. 58.29). Ms. Cousin advised GEICO that she would check her availability for the IME, and provided medical records of her third epidural injection. (*Id.*). On October 30, 2009, Ms. Cousin advised GEICO she would not be available for the scheduled IME, and attached a copy of her pip log. (Doc. 58.31). By November 5, 2009, GEICO and Ms. Cousin agreed that the IME could take place on November 9, 2009. (Doc. 58.32). On the next day, November 6, 2009, Ms. Cousin cancelled the IME scheduled for November 9, 2009, because she underwent a percutaneous endoscopic laser discectomy and arthroscopic laser facet ablation at L4–L5 on November 4, 2009 with Dr. Gomes. (Doc. 58.33 at 3). Along with her notice of cancellation, Ms. Cousin informed GEICO that her total out of pocket expenses were approximately $60,000.00 and that she filed a state court lawsuit for uninsured motorist benefits and would effect service of process against GEICO if Ms. Cousin did not receive the full $100,000.00 policy limits by November 11, 2009.[6] (*Id.* at 2 and 11).

---

6. A substantial portion of the $60,000.00 was comprised of costs from the surgery, includ-

On November 11, 2009, GEICO sent a fax to Ms. Cousin which outlined its efforts to resolve her UM claim, its belief that the cost of the surgery with Dr. Gomes was unreasonable, its desire to reschedule the IME, and an increased offer of $14,104.00. (Doc. 58.36). Ms. Cousin responded the following day by providing another report from Dr. Gomes which stated his belief that Ms. Cousin sustained a permanent lumbar injury resulting from her accident. (Doc. 58.37 at 3). Citing this report, Ms. Cousin stated her belief that she is entitled to the full amount available under her UM policy and that she would extend the deadline for GEICO to extend the UM policy limits to November 12, 2009 at 2:00 p.m. (*Id.* at 2). Ms. Cousin went on to warn GEICO that "all offers to settle this case within [the] policy limits will be *withdrawn*" after the deadline. (*Id.*) (emphasis in original). On December 11, 2009, GEICO responded to Ms. Cousin's November 12, 2009 correspondence which stated GEICO's disagreement with Ms. Cousin's valuation of the case, and that the pending state lawsuit would be handled by GEICO's staff counsel attorney's office. (Doc. 58.38). The state case went to trial and the jury rendered a verdict against GEICO in the amount of $1,305,000.00. (Doc. 58.40). Pursuant to the limits of her policy, Ms. Cousin was only entitled to recover $100,000.00 of the judgment against GEICO. In an attempt to collect the remaining amount—less any offsets—of approximately $1,173,889.30, Ms. Cousin brings this instant suit claiming that GEICO act-ed in bad faith in attempting to settle her UM claim. After conducting discovery, GEICO filed the instant motion for summary judgment claiming that the facts are such that no reasonable juror could find that GEICO acted in bad faith.

## II. STANDARD OF REVIEW

■ Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A).[7] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *See Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

ing: $27,340.00 for the surgeon; $375.00 for the preoperative exam; $16,000.00 for hospital; and $3,500.00 for anesthesia.

7. Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

*Id.* Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

■■ The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro,* 38 F.3d 1571, 1578 (11th Cir.1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." *Mize,* 93 F.3d at 742 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## III. DISCUSSION

■■ In Florida, a first-party bad faith claim arises when an insured sues its own insurance company for an improper denial of benefits. *Chalfonte Condo. Apartment Ass'n, Inc. v. QBE Ins. Corp.,* 695 F.3d 1215, 1222 (11th Cir.2012) (quoting *QBE Ins. Corp. v. Chalfonte Condominium Apartment Ass'n, Inc.,* 94 So.3d 541, 546 n. 1 (Fla.2012) (citation omitted)). "A first party bad faith action is a separate and distinct cause of action from the underlying claim for UM benefits" and allows the insured to "recover damages in excess of the policy limits." *Gianassi v. State Farm Mut. Auto. Ins. Co.,* 60 F.Supp.3d 1267, 1269 (M.D.Fla.2014) (citing *Allstate Ins. Co. v. Jenkins,* 32 So.3d 163, 165 (Fla. 5th DCA 2010) and Fla. Stat. § 627.727(10)). An insurance company becomes liable for damages beyond the policy limits when it fails to attempt "in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155.

■■ The determination as to whether an insured has acted in good faith based is based on the "totality of the circumstances," which, among others things, considers whether the insurer investigated the facts surrounding the event, gave fair consideration to reasonable settlement offers under the circumstances, and settled where possible if a reasonably prudent person would have settled. *Macola v. GEICO,* 953 So.2d 451, 455 (Fla.2006) (quoting *Boston Old Colony Ins. Co. v. Gutierrez,* 386 So.2d 783, 785 (Fla.1980)); *see also QBE Ins. Corp.,* 94 So.3d at 546 (citation omitted). In pursuing settlement in an UM claim, the Florida Supreme Court has explained that "to fulfill the duty of good faith, an insurer does not have to act perfectly, prudently, or even reasonably. Rather, insurers must 're-frain from acting solely on the basis of their own interests in settlement.'" *Messinese v. USAA Cas. Ins. Co.,* 622 Fed.Appx. 835, 839 (11th Cir.2015) (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet,* 658 So.2d 55, 58 (Fla.1995)).

Mindful of the insurer's duty of good faith, "[t]he justification for bad faith jurisprudence is as a shield for insureds—not as a sword for claimants." *Noonan v. Vermont Mut. Ins. Co.*, 761 F.Supp.2d 1330, 1336 (M.D.Fla.2010) (internal quotations omitted).

## A. The Cure Period

 Under Florida law, before an insured can initiate a first-party bad faith suit, the insured must file a civil remedy notice under Florida Statutes section 624.155. *Porcelli v. OneBeacon Ins. Co.*, 635 F.Supp.2d 1312, 1316 (M.D.Fla.2008). Once filed, the insurer has a sixty day safe-harbor period (or "cure" period) in which to cure the deficiency noted in a civil remedy notice. *Harris v. GEICO Gen. Ins. Co.*, 619 Fed.Appx. 896, 898–99 (11th Cir.2015) (unpublished) (citing Fla. Stat. § 624.155(3)(d)). "The purpose of the civil remedy notice is to give the insurer one last chance to settle a claim with its insured and avoid unnecessary bad faith litigation." *Lane v. Westfield Ins. Co.*, 862 So.2d 774, 779 (Fla. 5th DCA 2003).

 The first date that Ms. Cousin made a demand for her UM benefits was on August 10, 2009. In demanding the full $100,000.00 available under the policy, Ms. Cousin attached various medical records but failed to attach a pip log or any bills. Ms. Cousin did not wait for GEICO to respond to her initial demand for the policy limits, but instead filed her First CRN on the same day as her initial demand. By August 26, 2009, less than three weeks after Ms. Cousin's initial demand, GEICO reviewed the demand, and realized that Ms. Cousin had already received $10,000.00 from Ms. Bratcher's BI coverage. GEICO requested all of Ms. Cousin's pip logs and billing information to see where the additional $100,000.00 of damages arose. Despite multiple requests for the information, Ms. Cousin did not pro-

vide her medical bills and pip log before the expiration of the sixty day safe-harbor period. Though Ms. Cousin claimed that Dr. Gomes thought she could likely be a good candidate for a lumbar fusion procedure, she provided no records of his opinion. After noting that Ms. Cousin had only provided a medical bill for $135.00, with no pip log, no recommendation for surgery, and no lost wage documentation, on October 8, 2009, GEICO offered $5,135.00 to resolve Ms. Cousin's UM claim. In its offer, GEICO requested the MRI films of Ms. Cousin's back so GEICO could conduct an IME.

 Insurers have no obligation to accept settlement offers without having the opportunity to investigate a claim. *Johnson*, 318 Fed.Appx. at 851 (citations omitted). Indeed, before an insurer's obligation to settle is triggered, the insurer must have a reasonable opportunity to "make inquiry and evaluate [the] merits of [a] claim." *Id.* (citing *DeLaune v. Liberty Mut. Ins. Co.*, 314 So.2d 601 (Fla. 4th DCA 1975)). Curiously, Ms. Cousin filed her First CRN on the same day she demanded UM benefits from GEICO, accusing GEICO of acting in bad faith before it even had a chance to respond to her claim. Furthermore, at no time during the cure period did GEICO have a reasonable opportunity to evaluate Ms. Cousin's claim because she failed to provide information necessary for GEICO to conduct a meaningful investigation. Without the ability to evaluate the value of Ms. Cousin's claim, GEICO was left to only guess as to Ms. Cousin's damages. Accordingly, GEICO cannot be said to have acted in bad faith for its initial offer of $5,135.00 during the first cure period.

 The fact that Ms. Cousin may have incurred non-economic damages in the form of pain and suffering does nothing to sway the Court's ruling. Consistent with Florida law, Ms. Cousin's insurance

contract required a "[p]ermanent injury within a reasonable degree of medical probability" before an award for non-economic damages could be paid. (Doc. 58.2 at 12 and 31);[8] *see also Harris,* 619 Fed. Appx. at 899–900 (holding that according to Florida law and the same contract language regarding non-economic damages used in this case, non-economic damages are only available when a permanent injury is established within a reasonable degree of medical probability) (citing Fla. Stat. 627.737(2)(b)). To show a permanent injury the plaintiff must either present objective medical findings or subjective complaints supported by expert medical testimony in order to establish both the existence and permanency of the alleged injury. *See Harris,* 619 Fed.Appx. at 899–900 (quoting *City of Tampa v. Long,* 638 So.2d 35, 37–38 (Fla.1994)) (emphasis in original).

"[B]ad faith action focuses on the actions taken by [the insurer], considering all of the circumstances known to it, at the time such actions were taken." *Vaughn v. Producers Agric. Ins. Co.,* 111 F.Supp.3d 1251, 1262–63 (N.D.Fla.2015). Ms. Cousin fails to provide any evidence that GEICO knew or should have known of any objective medical findings establishing that she sustained a permanent injury as a result of the accident "within a reasonable degree of medical probability." Nor did she claim to have a permanent injury, or support such a claim by expert medical testimony that established within a reasonable degree of medical probability that she suffered a permanent injury. Therefore, GEICO cannot be said to have acted in bad faith for failing to consider non-economic damages Ms. Cousin may have suffered in its initial offer.

**8.** The insurance contract provided other grounds for the payment of non-economic damages for other events not at issue in this case.

## B. Post Cure Period

### 1. *November 12, 2009 Deadline*

 Consistent with the premise that an insurance company must be afforded a reasonable opportunity to investigate and evaluate a claim before its obligation to settle arises is the ability of an insurer to resist a forced settlement based on the allegations of its insureds regarding his or her damages, even when those allegations are supported by medical reports. *DeLaune,* 314 So.2d at 603. Instead, an insurer may conduct its own inquiry so long as that inquiry is carried-out in a timely fashion and with due diligence. *Id.* ("Since when does one party to a lawsuit have to accept at face value the medical information furnished by the other party ... ?"); *see also Johnson,* 318 Fed.Appx. at 851.

 Despite claiming that GEICO failed to cure the deficiency noted in the First CRN, Ms. Cousin gave GEICO new deadlines to remit the policy limits to her before filing suit. Following the expiration of the cure period, Ms. Cousin first gave GEICO a deadline of November 11, 2009, which was later extended to November 12, 2009. However, Ms. Cousin failed to assist GEICO in settling her claim before her given deadlines of November 11 and 12, 2009. GEICO made numerous attempts to obtain medical records, to obtain medical bills, and to conduct an independent medical evaluation. Because Ms. Cousin's efforts frustrated GEICO's attempts to conduct a meaningful evaluation of her claim and to make an informed settlement offer before her given deadlines, she cannot now claim that GEICO acted in bad faith for its "low ball" offer to settle her UM claim.[9]

**9.** Ms. Cousin relies on two offered experts in her response to GEICO's Motion, Adjuster Susan Kaufman and Attorney William Stone. Ms. Kaufman opines that GEICO's investigation and evaluation were "incomplete" caus-

On October 12, 2009, two days after the cure period, and four days after GEICO's initial offer, Ms. Cousin responded to GEICO's initial offer by filing the Second CRN and providing GEICO with evidence of medical expenses totaling $11,882.00 and lost wages of approximately $2,000.00.[10] With less than $15,000.00 of damages three months removed from the accident, "[t]his [was] not the usual bad faith claim where damages are obvious and it is clear that the damages will exceed policy limits[.]" *316, Inc. v. Maryland Cas. Co.*, 625 F.Supp.2d 1187, 1193 (N.D.Fla.2008). The fact that a jury later decided Ms. Cousin suffered damages in excess of the policy limits does not mean that GEICO acted in bad faith, so long as GEICO acted in good faith at the time of its offer or refusal. *See Id.* ("Even when it is later determined by a court or arbitration that the insurer's denial was mistaken, there is no cause of action if the denial was in good faith.") (internal quotation and citation omitted).

Within nine days of Ms. Cousin's Second CRN, GEICO endeavored to conduct an IME of Ms. Cousin to determine for itself the injuries she suffered. There is no evidence GEICO's request was made in bad faith, especially given that Ms. Cousin had previously undergone tests on her lumbar before the accident, and that the original radiology reports on Ms. Cousin's spine following the accident mentioned nothing about a lumbar injury, or recommendation for surgery. After Ms. Cousin agreed to undergo an IME, GEICO coordinated with Ms. Cousin for the IME to occur on November 1, 2009. Ms. Cousin cancelled the appointment on October 30, 2009. Undeterred, GEICO again coordinated with Ms. Cousin on November 5, 2009 to have the IME performed on November 9, 2009. On November 6, 2009, Ms. Cousin cancelled that appointment too, citing Dr. Gomes' recommendation that Ms. Cousin not undergo an IME for at least three weeks owing to her November 4, 2009 percutaneous endoscopic laser discectomy and arthroscopic laser facet ablation. Along with her cancellation, Ms. Cousin informed GEICO that, including her recent surgery, her medical bills were approximately $60,000.00, and that she would serve GEICO if she did not receive the policy limits by November 11, 2009.[11]

Instead of remitting the policy limits, on November 11, 2009, GEICO responded by questioning the costs associated with Ms. Cousin's percutaneous endoscopic laser discectomy and arthroscopic laser facet ablation, insisting on an IME, and increasing its offer to $14,104.00. On November 12, 2009, and for the first time during the claim process, Ms. Cousin provided a report that she suffered a permanent back injury.[12] Based on this newly disclosed

ing GEICO's offer to be unreasonable. (Doc. 66.5). As explained herein, the Court finds GEICO's "incomplete" investigation was not GEICO's fault. Mr. Stone opines that GEICO should have paid the policy limits on account of Dr. Gomes' November 6, 2009 report. (Doc. 54.1 at 4). Assuming Mr. Stone's testimony is admissible, he only opines to the value of Ms. Cousin's claim, which does not address GEICO's right to conduct an investigation to makes its own findings regarding Ms. Cousin's injuries.

**10.** Ms. Cousin's ledger of damages supports the reasonableness of GEICO's initial offer and counters Ms. Cousin's position that GEICO's offer was a "low ball" offer. After con-

sidering that Ms. Cousin had already received $10,000.00 in bodily injury coverage, this left her losses just shy of $5,000.00, which was less than GEICO's offer of $5,135.00.

**11.** Ms. Cousin filed suit in state court to recover her UM benefits on November 6, 2009. *Cousin v. GEICO*, 16–2009–CA–017158 (Fla. 4th Cir.Ct.2009).

**12.** "That [the insured] had a percutaneous discectomy and had radiographic evidence of a bulging discs is insufficient, absent medical testimony, to demonstrate the presence of a permanent injury. *Harris v. Geico Gen. Ins. Co.*, 961 F.Supp.2d 1223, 1232 (S.D.Fla.2013) *aff'd*, 619 Fed.Appx. 896 (11th Cir.2015).

information, Ms. Cousin reiterated her demand for the policy limits, and warned GEICO that "all offers to settle this case within [the] policy limits will be *withdrawn*" after the November 12, 2009, 2:00 p.m. deadline. GEICO failed to settle by the November 12, 2009 deadline.

Notwithstanding that Ms. Cousin only offered evidence of less than $15,000.00 of expenses (of which $10,000.00 were already covered by Ms. Bratcher's BI coverage), she persisted in her demand for the full $100,000.00 in policy coverage from GEICO. Though, much of Ms. Cousin's complaint is focused around the medical records from Dr. Gomes, she did not provide GEICO a copy of those records until November 6, 2009. This was only six days before her November 12, 2009 deadline, and well before Ms. Cousin could undergo an IME. Thus, to force GEICO to settle Ms. Cousin's UM claim by the November 12, 2009 deadline would be to force GEICO to forfeit its right to conduct an IME before it extended a settlement offer. To not allow GEICO to conduct an IME before entering in a settlement would force GEICO to accept at face value Ms. Cousin's claims and valuation while depriving GEICO of a meaningful opportunity to conduct its own investigation into what damages Ms. Cousin suffered as a result of the accident. The Court considers this scenario particularly troubling given the gradual revelation of Ms. Cousin's injuries. Ms. Cousin's First and Second CRN failed to claim a permanent injury, her initial radiology reports failed to mention any lumbar issues, and there was reason for GEICO to suspect that she may have had a preexisting issue with her lumbar area given that she had undergone diagnostic tests on it before the accident. Yet, Ms. Cousin thwarted GEICO's efforts to conduct a meaningful independent review of her claim by her delay in providing medical records, by her delay in providing medical bills, and by her refusal to submit herself to an IME. Therefore, her position that GEICO acted in bad faith for its failure to settle her UM claim for $100,000.00 by November 12, 2009 is untenable. *See Vaughn v. Producers Agric. Ins. Co.*, 111 F.Supp.3d 1251, 1255 (N.D.Fla.2015) ("Information asymmetry, above all else, hinders pretrial settlement.").

Indeed, Ms. Cousin did not offer evidence of a permanent injury until sometime on November 12, 2009, the day after the original deadline she gave GEICO to pay the full amount available under the UM policy. This demonstrates exactly why GEICO's request for an IME was reasonable—the possibility that Ms. Cousin had not provided all the information GEICO would reasonably want to know before deciding to settle for the maximum of the UM policy benefits. While Ms. Cousin extended the deadline to November 12, 2009 at 2:00 p.m. in her notice of permanent injury, GEICO did not have an opportunity to meet the November 12 deadline because Ms. Cousin could not undergo an IME until November 25, 2009 at the earliest, which deprived GEICO of the opportunity of conducting its own evaluation before Ms. Cousin's given deadline.

*2. December 12, 2009 and October 2010*

Lastly, the Court considers Ms. Cousin's assertions that GEICO could have settled her claim up through December 12, 2009 and October 2010 despite her deadlines to the contrary. If this is true, the argument goes, then GEICO had plenty of time to complete its investigation of Ms. Cousin's claim, which would have shown damages in excess of the policy limits and caused GEICO to remit the policy limits to Ms. Cousin. First, the Court notes that Ms. Cousin fails to point to any evidence or law that GEICO could have cured as a matter of right Ms. Cousin's claim beyond October 10, 2009, the sixtieth day following Ms.

Cousin's First CRN. *See Macola,* 953 So.2d at 456 ("In the event the insurer does not cure the alleged violation within the sixty-day period in section 624.155(3)(d), the claimant may proceed with the civil action for statutory bad faith.").

Moreover, Ms. Cousin's position and actions belie her assertion that GEICO could have cured by December 12, 2009. Ms. Cousin explicitly stated in her response that GEICO failed to cure the first CRN, (Doc. 66 ¶ 13). If this is true, then GEICO could not have stopped Ms. Cousin from proceeding in the underlying lawsuit. Additionally, on November 6, 2009, long before the expiration of the Second CRN purported cure period, Ms. Cousin filed her underlying state court action, which is not allowed before the expiration of the cure period. That state suit proceeded and resulted in the entry of judgment against GEICO for the underlying UM claim.

Finally, GEICO did not need to exhaust every means available in attempting to settle Ms. Cousin's claim beyond her stated deadline of November 12, 2009. *See Novoa v. GEICO Indem. Co.,* 542 Fed. Appx. 794, 796 (11th Cir.2013). In affirming the grant of summary judgment to the defendant/insurer in *Novoa,* the Eleventh Circuit noted that the plaintiff/insured refused on multiple occasions to negotiate with the defendant/insurer and constantly delayed giving information to the insurer which would allow the insurer to formulate a settlement offer. The Eleventh Circuit also noted the incentive an insured has to defeat the efforts of an insurer in settling a claim in order to "plan to proceed with a bad faith claim." *Id.* at 797.

In this case, Ms. Cousin only ever offered to settle for the policy maximum, and unequivocally stated her offers to settle within the policy limits were withdrawn after 2:00 p.m. on November 12, 2009.

Even assuming Ms. Cousin would have accepted the policy proceeds after her given deadline, the relevant inquiry is whether GEICO should have known that Ms. Cousin would amenable to settlement within the policy limits after November 12, 2009. *See Vaughn,* 111 F.Supp.3d at 1262–63. On this point, Ms. Cousin cites to no evidence that show that GEICO should have known she meant something other than what she said when she warned GEICO that she would not accept a settlement within the policy limits after November 12, 2009. Furthermore, Ms. Cousin's lack of willingness to settle was corroborated by her perpetual delay in providing GEICO necessary information to make an informed offer and by her having already filed suit on November 6, 2009.

Accordingly, after due consideration, it is

**ORDERED:**

1. GEICO's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 53) is **GRANTED**.

2. The Clerk of the Court is directed to enter judgment in favor of GEICO, and against Ethel Cousin.

3. The Clerk of the Court is further directed to terminate all pending motions and deadlines and close the file.

**DONE** and **ORDERED** in Jacksonville, Florida this *15th* day of December, 2015.